UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAR 2 8 2018

Optima Media Group Limited, et al.,

        Plaintiffs,

–v–

Bloomberg L.P.

        Defendant.

17 Civ. 1898 (AJN)

MEMORANDUM OPINION & ORDER

ALISON J. NATHAN, District Judge:

This case arises from a contract between Plaintiffs Optima Media Group Limited ("Optima") and Optima Sports Management International (UK) Limited ("Optima Sports Management") and Defendant Bloomberg L.P. ("Bloomberg") pursuant to which Optima produced Africa-specific business news programming and broadcast that content, along with other Bloomberg television programming, in Africa. Plaintiffs allege that Bloomberg breached the contract by improperly terminating it in May 2015. Bloomberg insists that it was justified in terminating the contract, and it has filed a motion to dismiss Plaintiffs' complaint. The Court concludes that oral argument is unnecessary, and for the reasons explained below, the motion is granted in part and denied in part.

I.    BACKGROUND

The Court takes the following facts from Plaintiffs' amended complaint, Dkt. No. 32 (FAC), and from the contract at issue in this case. *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (explaining that a complaint includes any statements or documents incorporated in it by reference and that even when a plaintiff does not attach to the

1

complaint or incorporate by reference a document "'upon which it solely relies and which is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment" (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991)). The Court does not consider the April 2015 email provided by Bloomberg because it is not incorporated in, nor integral to, the complaint, and it is not clear that the email provided by Bloomberg is the same communication mentioned in the complaint. *See* FAC ¶ 129 (describing communications from Optima to Bloomberg the day after receiving an email on April 29, 2015); Dkt. No. 35, Ex. B (email from Optima to Bloomberg sent on April 29, 2015).

Bloomberg provides news and financial information and operates a 24-hour television channel, known as Bloomberg Television. FAC ¶ 19. In 2011, Bloomberg began looking for an African media company that it could partner with to produce Africa-specific business television programming, which would be branded Bloomberg Television Africa. FAC ¶ 20. At that time, Optima was a "successful African media company" that had already produced and broadcast content like Nigerian Idol, the Olympic Games, and the FIFA World Cup. FAC ¶ 24. Accordingly, Bloomberg entered negotiations with Optima for Optima to create business news programming in Africa and broadcast that content, along with other Bloomberg Television programming, in West Africa. FAC ¶¶ 23-25, 28. Optima was not represented by counsel during those negotiations. FAC ¶ 26.

In January 2012, Bloomberg entered into a content sharing and licensing agreement (the "Agreement") with Optima and Optima Sports Management. FAC ¶¶ 2, 27; *see* Dkt. No. 35, Ex. A (Agreement). The parties agreed that Optima Sports Management would serve as the guarantor for Optima. *See* Agreement. Optima agreed to finance the project and to pay

Bloomberg license fees in exchange for Optima's right to control the distribution, retransmission, and exhibition of Bloomberg content in West Africa and to use Bloomberg's trademarks, service marks, and logos. FAC ¶¶ 29-30. Under the terms of the Agreement, beginning on or before June 30, 2012, Optima would produce a live weekday programming window ("the Channel Window") that would air for not more than four hours per day and would use the Bloomberg trademark. Agreement ¶ 1(a)(i). Optima was responsible for the set-up and maintenance costs for the Channel Window, as well as its production and administration and management of its day-to-day operations. Agreement ¶ 1(a)(ii)(a)-(b). Optima generated revenues in Nigerian currency, the naira, but the Agreement established that Optima's obligations to Bloomberg were payable only in US dollars. FAC ¶ 32. Optima also agreed to create or adapt a television studio in Lagos, Nigeria to meet Bloomberg's technical requirements. FAC ¶¶ 36-37. New York law governs the Agreement. Agreement ¶ 14(c).

The Agreement was to be in effect for a period of five years, but Bloomberg or Optima could terminate the Agreement before then for several reasons, including if the other party became insolvent. Agreement ¶ 8(b)(i)(b). In addition, Bloomberg could terminate the Agreement at any time without notice and without incurring any liability if the representations, warranties, or covenants made by Optima were no longer true. Agreement ¶ 8(b)(ii)(b). Optima warranted, represented, and covenanted that it would fulfill its obligations to Bloomberg under the Agreement, promote the Channel Window and Bloomberg brand, and obtain "any and all rights, licenses, approvals, clearances, releases, local, and international authorizations necessary to perform its obligations" under the Agreement. Agreement ¶ 12(b). The Agreement also provides that Bloomberg shall not be liable for consequential damages, Agreement ¶ 13(c)(1), and that "[n]o changes, modifications, or waivers regarding this Agreement shall be binding

unless in writing and signed by the Parties," Agreement ¶ 14(d). The Agreement continues, "No failure of either Party to exercise or enforce any of its rights under this Agreement shall act as a waiver of such rights." Agreement ¶ 14(d). Finally, the Agreement contains a force majeure clause, which establishes that neither Bloomberg nor Optima shall be liable for delays or failure to perform caused by events beyond the control of the party, including "any legal prohibition, decree, regulation, or requirement of any governmental authority having jurisdiction." Agreement ¶ 14(g). In that case, the Agreement provides that the affected party should notify the other party of the nature and anticipated duration of the force majeure and during that time, Bloomberg and Optima would be excused from performance. Agreement ¶ 14(g).

Around May 2012, the parties to the Agreement amended the Agreement to extend its territorial reach over the entire continent of Africa and lengthen the term of the contract to eight years. FAC ¶ 49.

Although Optima and Bloomberg discussed that Bloomberg would formally announce the partnership and hold a formal launch for it, Bloomberg did not do so until the fall of 2013. FAC ¶ 60. According to Optima, the delay in the public launch delayed Optima's ability to produce live weekday programming on or before June 30, 2012, as the Agreement had required. FAC ¶ 61. Nevertheless, the parties agreed to keep working together, and Bloomberg continued to accept license-fee payments from Optima after June 2012. FAC ¶ 61. Bloomberg did not inform Optima that the delay in producing programming was a breach of Optima's obligations under the Agreement. FAC ¶ 61.

In November 2012, Optima's Chairman created Bloomberg Television Nigeria Limited (BTVA Nigeria) to support operations in Lagos, Nigeria. FAC ¶ 64. BTVA Nigeria was responsible for employing personnel in Lagos and constructing the Lagos studio. FAC ¶ 64.

4

In July 2013, Optima's Chairman created Bloomberg Television Africa Limited ("BTVA UK"), which allowed Optima to secure revenue in foreign currencies from clients outside Nigeria. FAC ¶ 70. BTVA UK was responsible for paying employees and contractors working out of the UK. FAC ¶ 70.

During 2013, the Nigerian Central Bank had a policy that required it to approve each proposed exchange for foreign currency payments exceeding certain amounts. FAC ¶ 72. Accordingly, during that year, "BTVA UK and BTVA Nigeria occasionally struggled to access dollars and pounds and, in those instances, were delayed in paying employees and contractors who were to be compensated in foreign currency." FAC ¶ 72. Bloomberg was aware of the foreign-exchange regulations and the resulting delay in payments, but Optima made clear that any delays in payments "were not due to a lack of funds, but a difficult regulatory environment." FAC ¶ 73.

In October 2013, Bloomberg officially launched the Bloomberg Television Africa project. FAC ¶ 79.

Around November 2013, Optima began producing content at Bloomberg's London studios and planned to continue producing content out of London until Optima could complete the Lagos studio. FAC ¶¶ 81-82.

In or around May 2014, Bloomberg and Optima entered into discussions to renegotiate the Agreement. FAC ¶ 91. Bloomberg sought, inter alia, complete editorial control over the Channel Window and wanted the Channel Window to be distributed from London, not Lagos. FAC ¶ 93. During the renegotiations, Bloomberg requested that Optima stop using the Bloomberg name in any marketing materials going forward. FAC ¶ 98. The renegotiations delayed Optima from launching its studio in Lagos and from obtaining a return on its investment.

FAC ¶ 99.

In the fall of 2014, the Central Bank of Nigeria restricted foreign-exchange trading to a single platform, thereby seriously restricting foreign currency exchanges. FAC ¶¶ 7, 105. Optima discussed the restrictions with Bloomberg and stated that it could not predict when the restrictions would be lifted and that access to foreign currency would be limited for the foreseeable future. FAC ¶ 107. "As a result of the Nigerian government's currency restrictions, beginning in the fall of 2014, access to dollars and pounds in Nigeria was, at times, completely foreclosed," which "led to delays in BTV Nigeria and BTVA UK paying certain staff members, consultants, and other third-party contractors who were guaranteed payments in foreign currency." FAC ¶ 109. Bloomberg was aware of Nigeria's foreign-exchange constraints. FAC ¶ 110.

During this time period, Optima continued to produce content out of Bloomberg's London studio, finalized its studio in Lagos, and paid the requisite license fees to Bloomberg, which accepted them. FAC ¶¶ 112-13; *see also* FAC ¶ 122 ("By the spring of 2015, Optima had completed the Lagos studio, and had begun the process of migrating staff from the UK to Nigeria and on-boarding additional staff in Lagos."). The Bloomberg Television Africa launch date was scheduled for the first half of May 2015. FAC ¶ 124. The parties also continued to negotiate a revised content sharing and licensing agreement through the end of 2014 and into 2015. FAC ¶ 116.

On April 29, 2015, Optima and Bloomberg received emails from a journalist inquiring about rumors of nonpayment or late payment of Bloomberg Television Africa staff and contractors. FAC ¶¶ 9, 127. In response, Optima explained to Bloomberg that the alleged non-payment could be due to the currency restrictions. FAC ¶ 129.

At a meeting on May 6, 2015, Optima "presented Bloomberg representatives with Optima's plan to settle any . . . obligations impacted by the foreign-exchange restrictions," and "confirmed that its existing credit facilities provided more than enough capital to clear BTVA UK's production-payments backlog that had resulted from the foreign-exchange crisis, and that the additional facilities would be more than adequate to fund the Project in Nigeria for years into the future." FAC ¶ 135.

On May 7, 2015, Bloomberg delivered a letter to Optima informing it that, pursuant to Sections 8(b)(i)(b) (Optima became insolvent), 8(b)(ii)(b) (the representations, warranties, or covenants made by Optima were no longer true), and 12(b) (setting forth Optima's representations, warranties, and covenants), it was exercising its right to terminate the Agreement. FAC ¶ 140. According to Optima, by May 7, 2015, the launch of the Lagos studio was "merely days away," and "Optima had obtained all necessary approvals and licenses from the Nigerian authorities to produce content and broadcast through the Channel Window." FAC ¶ 152.

On March 15, 2017, Plaintiffs filed suit against Bloomberg. Dkt. No. 1. Bloomberg filed a motion to dismiss, Dkt. No. 15, and in response to that motion Plaintiffs filed an amended complaint, Dkt. No. 32. Bloomberg's motion to dismiss the original complaint, Dkt. No. 15, and its request for oral argument on that motion, Dkt. No. 18, are therefore denied as moot.

In their amended complaint, Plaintiff assert two causes of action: (1) a breach of contract claim for Bloomberg's alleged wrongful termination of the Agreement; and (2) a breach of the implied covenant of good faith and fair dealing. FAC ¶¶ 176-88. Bloomberg moves to dismiss the amended complaint. Dkt. No. 33. For the reasons explained below, that motion is granted in part and denied in part.

## II. MOTION TO DISMISS

### A. Legal Standard

To survive a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted, the claimant must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The allegations must "state a claim to relief that is plausible on its face." *Id.* at 570.

### B. Grounds for Terminating the Agreement

Bloomberg contends that Plaintiffs have failed to state a breach of contract claim because Bloomberg properly terminated the Agreement. According to Bloomberg, it was entitled to terminate the Agreement because Optima became insolvent and because Optima's representations, warranties, and covenants—specifically, that Optima would administer and manage the Channel Window and would obtain all necessary regulatory approvals to perform under the Agreement—were no longer true. Dkt. No. 34 (Def. Memo) at 9-18.

Plaintiffs argue that even if at some point Bloomberg may have been justified in terminating the Agreement on those bases, it chose to accept Optima's performance under the Agreement and therefore either waived its right to terminate on those grounds or elected a remedy other than termination. Dkt. No. 41 (Pl. Memo) at 11-14. Bloomberg replies that waiver should not be implied in this situation, especially because the Agreement contains a non-waiver clause. Dkt. No. 43 (Def. Reply) at 1-4.

At this stage, the Court need not decide whether Bloomberg waived its right to terminate or elected a different remedy because assuming arguendo that Bloomberg did not do so and thus

still had the right to terminate the Agreement, the complaint sufficiently alleges that Bloomberg improperly terminated the Agreement.

### 1. Insolvency

Bloomberg asserts that Optima was insolvent in May 2015. Def. Memo at 9-13. The Agreement provides that Bloomberg or Optima could terminate the Agreement if the other became insolvent. Agreement ¶ 8(b)(i)(b). Plaintiffs insist that Optima did not in fact become insolvent and that the BTVA entities' insolvency, if any, cannot be imputed to Optima. Pl. Memo at 14-16.

The "time-honored meaning of insolvency, in the absence of a statute specifying another meaning, is inability to meet obligations as they mature in [the] ordinary course of business." *Meighan v. Finn*, 146 F.2d 594, 595 (2d Cir. 1944); *see also Sec. Inv'r Prot. Corp. v. Glob. Arena Capital Corp.*, 164 F. Supp. 3d 531, 537-38 (S.D.N.Y. 2016) (explaining that the equity test of insolvency, as opposed to the bankruptcy test, "equates insolvency with a lack of liquid funds, or the inability to pay one's debts in the ordinary course of business as the debts mature" (quoting *In re Poseidon Pool & Spa Recreational, Inc.*, 443 B.R. 271, 280 (E.D.N.Y. 2010)).

As evidence of Optima's insolvency, Bloomberg points to portions of the complaint that mention currency restrictions imposed by the Nigerian government.[1] Def. Memo at 10. Although the complaint does acknowledge that Nigerian currency restrictions sometimes caused payments from BTVA Nigeria and BTVA UK to be delayed, the complaint specifically mentions

---

[1] Bloomberg also cites an April 2015 email referenced in the complaint. Def. Memo at 10. As previously discussed, the Court does not consider that email at this stage because it is not incorporated by reference in or integral to the complaint. In any event, the Court notes that although the email recognizes that there were "some cash flow issues over the last 6 months which . . . affected timely payments to a number of staff and suppliers," it also declares, "[The] 'hard currency' related cash flow issues have now finally been rectified . . . . This allows us to clear the backlog for staff and suppliers who are still outstanding." Dkt. No. 35, Ex. B.

delays that occurred in 2013 and "beginning in the fall of 2014." FAC ¶¶ 72, 109. However, it is not clear whether Optima, or the BTVA entities, was insolvent at the time of termination. Indeed, the complaint states that at the May 6, 2015 meeting with Bloomberg representatives, Optima presented plans to settle any "obligations impacted by the foreign-exchange restrictions," described additional financing it had received, and "confirmed that its existing credit facilities provided more than enough capital to clear BTVA UK's production-payments backlog that had resulted from the foreign-exchange crisis, and that the additional facilities would be more than adequate to fund the Project in Nigeria for years into the future." FAC ¶ 135. Assuming arguendo that the delayed payments constitute insolvency and can be attributed to Optima, it is not clear whether Optima was in fact insolvent on May 7, 2015, when Bloomberg terminated the Agreement. Because the Court cannot determine at this stage whether Optima was insolvent at the time of termination, Bloomberg's motion to dismiss the breach of contract claim on this ground is denied.

### 2. Representations, Warranties, and Covenants

Bloomberg also argues that it was justified in terminating the Agreement because Optima's representations, warranties, and covenants were no longer true in May 2015. Def. Memo at 13-16. The Agreement authorizes Bloomberg to terminate the Agreement at any time without notice if any of Optima's representations, warranties, and covenants are no longer true. Agreement ¶ 8(b)(ii)(b). Bloomberg argues that two such representations were no longer true in May 2015: (1) that Optima would fulfill its obligation to administer and manage the Channel Window, and (2) that Optima would obtain all necessary regulatory approvals. Def. Memo at 13-16.

### i. Obligation to Administer and Manage the Channel Window

As part of the Agreement, Optima "warrant[ed], represent[ed], and covenant[ed]" that it would fulfill its obligations to Bloomberg "in accordance with the terms set forth in [the] Agreement." Agreement ¶ 12(b). Pursuant to the Agreement, Optima was responsible for the production and administration of the Channel Window, the management of its day-to-day operations, the payment of its set-up and maintenance costs, and other administrative functions typical for the operation of such a channel. Agreement ¶ 1(a)(ii)(a), (b)(i)-(ii), (b)(xii).

Bloomberg contends that Optima's representations about its ability to produce and manage the Channel Window were no longer true once Optima failed to pay its staff. *See* Def. Memo at 14. Although the complaint acknowledges that the BTVA entities sometimes had delays in remitting salary payments, *see, e.g.*, FAC ¶ 72, it is not clear that such a delay would render Optima's representations about its ability to administer and manage the Channel Window false. Indeed, the Agreement does not expressly state that Optima's obligations included paying staff, and there is no allegation in the complaint that the delayed payments harmed the production, administration, or management of the Channel Window by, for example, leading to the creation of poor-quality content, or causing production delays or work stoppages. According to Bloomberg, "Optima's failure to pay employee salaries over a period of months . . . jeopardized the success of the enterprise by creating the risk that personnel responsible for developing and maintaining the Channel Window would stop working." Def. Memo at 14. However, the complaint does not allege that the "enterprise" was placed in jeopardy or that personnel in fact stopped working. In any event, as discussed above, by May 2015 Optima may have secured funding to avoid future delays. *See* FAC ¶ 135. At this stage, therefore, it is not clear that Optima's representation that it would fulfill its obligation to

administer and manage the Channel Window was false in May 2015.

### ii. Obligation to Obtain All Necessary Regulatory Approvals

Bloomberg also argues that Optima's representation that it would obtain and maintain all licenses, approvals, clearances, releases, and authorizations necessary to perform its obligations under the Agreement, i.e., to operate the business in connection with its obligations under the Agreement, was no longer true in May 2015 because Optima was unable to obtain the regulatory approvals necessary to convert foreign currency. Def. Memo at 15-16.

However, the complaint does not state that Optima failed to obtain regulatory approvals but rather that the regulatory environment was "difficult," which sometimes caused delays in payments. *See* FAC ¶ 73. Moreover, as discussed above, the complaint alleges that Optima had secured sufficient funding by May 2015. *See* FAC ¶ 135. The complaint also alleges that at the time of the Agreement's termination, the Project's launch "was merely days away" and "Optima had . . . obtained all necessary approvals and licenses from the Nigerian authorities to produce content and broadcast through the Channel Window." FAC ¶ 152. Plaintiffs have thus alleged that they obtained the necessary regulatory approvals.

Accordingly, the Court denies Bloomberg's motion to dismiss Plaintiffs' breach of contract claim on the ground that Optima's representations, warranties, and covenants were no longer true in May 2015.

### C. Failure to Allege Adequate Performance

Bloomberg also states that Plaintiffs have failed to allege adequate performance of the Agreement by Optima. Def. Memo at 19-21. Bloomberg emphasizes that Optima admits that (1) it did not make payments due to staff and contractors; (2) it failed to obtain the necessary approvals to secure currency to pay its staff; and (3) it did not begin producing content until

November 2013, more than a year after the deadline set forth in the Agreement. Def. Memo at 19-20. Plaintiffs respond that any delay in payments due to staff and contractors, to obtaining necessary approvals, or to producing content was not material. Pl. Memo at 21. Bloomberg does not reply to this argument.

At this point, the Court cannot conclude that any of the alleged inadequacies in Optima's performance identified by Bloomberg were material. To the contrary, Plaintiffs have sufficiently alleged that Optima substantially performed under the Agreement. Indeed, as discussed above, the complaint states that as of May 2015, Optima had secured funding to make timely payments, and it alleges that Optima began producing content in November 2013, with a full launch in Lagos "merely days away" from May 7, 2015. *See* FAC ¶¶ 81, 135, 152. The motion to dismiss the breach of contract claim is therefore denied.

### D. Breach of the Implied Covenant of Good Faith and Fair Dealing

Bloomberg argues that Count Two of the complaint, alleging a breach of the implied covenant of good faith and fair dealing, should be dismissed because it is based on the same facts on which Plaintiffs' breach of contract claim is based. Def. Memo at 21-23.

New York "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life and Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). A plaintiff's breach of the implied covenant of good faith and fair dealing claim must allege facts different from those on which the breach of contract claim is based, including relief that is "not intrinsically tied to the damages allegedly resulting from the breach of contract." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 63 (S.D.N.Y. 2016) (quoting *Grant & Eisenhofer, P.A. v. Bernstein Liebhard LLP*, No. 14-cv-9839, 2015 WL

1809001, at *4 (S.D.N.Y. Apr. 20, 2015)); *see Presbyterian Healthcare Servs. v. Goldman Sachs and Co.*, 15-cv-6579, 2017 WL 1048088, at *12-13 (S.D.N.Y. Mar. 17, 2017). Breach of the implied covenant of good faith and fair dealing claims are frequently dismissed as duplicative when a breach of contract claim is also pled. *See ARI and Co., Inc. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003).

Here, the breach of contract and breach of the implied covenant of good faith and fair dealing claims are based, in part, on the same set of allegations or damages. Plaintiffs assert that Bloomberg breached the implied covenant by accepting Optima's performance and representing that the Project's launch was imminent when in fact Bloomberg was poised to terminate the Agreement, FAC ¶ 186; they also assert that when Bloomberg terminated the Agreement, it breached the contract and caused Plaintiffs to lose money they had "expended to pursue the Project in reliance on the Agreement," FAC ¶ 181. As part of both claims, therefore, Plaintiffs allege reliance on Bloomberg's commitment to the Agreement and losses incurred as a result of that reliance when Bloomberg terminated the Agreement. In that way, the claims overlap, and the breach of the implied covenant claim is duplicative of the breach of contract claim.

At the same time, though, Plaintiffs complain that Bloomberg breached the implied covenant by "delaying the Project's launch in Lagos by demanding a renegotiation of the original Agreement" and by "insisting from late 2014 into early 2015 that Optima cease marketing the Project as Bloomberg Television Africa." FAC ¶ 186. That conduct is unrelated to Bloomberg's termination of the Agreement and does not serve as a basis for the breach of contract claim. Moreover, although at first glance Plaintiffs seek the same damages for the breach of the implied covenant claim and the breach of contract claim—for the implied covenant claim, damages consisting of the advertising revenue Optima would have obtained had Bloomberg not delayed

the launch, FAC ¶ 188, and for the breach of contract claim, damages consisting of "lost revenue Plaintiffs would have earned after the Project launched," FAC ¶ 181—the claimed damages for those claims actually have different sources. The loss of revenue for the implied covenant claim would be that attributable to the delays caused by Bloomberg's renegotiation of the original Agreement, FAC ¶ 188, whereas the loss of revenue for the breach of contract claim would be that attributable to the termination of the Agreement. The claims are thus distinct.

Accordingly, to the extent that the breach of the implied covenant claim is based on Bloomberg's termination of the Agreement despite its representations that the Project's launch was imminent, the motion to dismiss the claim is granted. However, to the extent that the breach of the implied covenant claim is based on Bloomberg's delaying the launch in Lagos by demanding to renegotiate the Agreement, or insisting that Optima cease marketing the Project as Bloomberg Television Africa, the motion to dismiss the claim is denied.

### E. Consequential Damages

Finally, Bloomberg contends that Plaintiffs' request for consequential damages cannot be awarded under the Agreement. Def. Memo at 23-25. Plaintiffs maintain that the Agreement's limitation on liability should not be enforced because the provision is the result of unequal bargaining power between the parties and Bloomberg has engaged in bad faith, willful misconduct, or gross negligence. Pl. Memo at 23-24.

The Agreement provides that "in no event" shall Bloomberg be liable for any consequential damages. Agreement ¶ 13(c)(i). Consequential damages compensate a party for losses, "other than the value of the promised performance," that are incurred as a result of the other party's breach. *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000).

Parties to a contract are generally free to allocate risks and limit liability as they choose,

including by prohibiting consequential damages. *See World-Link, Inc. v. Citizens Telecom. Co.*, No. 99-cv-3054, 2000 WL 1877065, at *5 (S.D.N.Y. Dec. 26, 2000). "The parties may later regret their assumption of the risks of non-performance in this manner, but the courts let them lie on the bed they made, unless the provision is the result of unconscionable conduct or unequal bargaining power between the parties." *Camofi Master LDC v. College P'ship, Inc.*, 452 F. Supp. 2d 462, 478 (S.D.N.Y. 2006) (internal citations and quotation marks omitted). At least one court in this District, when faced with the argument that the limitation of liability provision at issue should not have been enforced because the breach was fraudulent, willful, or grossly negligent, explained that "an allegation that a breach of contract was willful rather than involuntary does not allow a court to disregard an unambiguous limitation of liability provision agreed to by parties of equal bargaining power." *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 318 (S.D.N.Y. 2002); *see also id.* ("I may not re-write how the parties defined their rights and obligations, allocated their risks, and limited their liabilities and rights of recovery.").

Here, it is appropriate to enforce the provision limiting liability. *See* Agreement ¶ 13(c)(i). Although Plaintiffs emphasize that Optima was not represented by counsel during the negotiation of the Agreement with Bloomberg, Pl. Memo at 24, all parties to the Agreement were sophisticated business entities. Indeed, Optima is a "successful African media company" that has produced content such as Nigerian Idol, the Olympic Games, and the FIFA World Cup, and it also had a branch in the UK. *See* FAC ¶ 24. That Bloomberg may have intentionally breached the contract does not suggest that the Court should "disregard an unambiguous limitation of liability provision." *DynCorp*, 215 F. Supp. 2d at 318.

Plaintiffs therefore cannot recover consequential damages under the Agreement. Specifically, Plaintiffs cannot receive damages for any profits, revenue, or benefits that they

would have received had the Agreement remained in place. *See, e.g.*, FAC ¶ 181 (seeking "lost revenue Plaintiffs would have earned after the Project launched"). The interest that accrued on loans expected to be repaid with proceeds from the Channel Window, *see* Def. Memo at 24, however, does not constitute consequential damages. Although Plaintiffs expected to repay the interest with proceeds from the Channel Window, they took out the loans to perform obligations under the Agreement.

### III. SEALING

Bloomberg requests that the Agreement be filed under seal or, in the alternative, with certain provisions redacted. *See* Dkt. No. 21. Plaintiffs oppose the request to file the Agreement under seal or with redactions. Dkt. Nos. 22, 31. The redactions proposed by Bloomberg are narrowly tailored to protect proprietary and commercially sensitive information. Accordingly, the Court grants the request to file the Agreement in redacted form.

In addition, Plaintiffs seek to file an Amendment to the Agreement, which, like the Agreement, Bloomberg requests be filed under seal or in redacted form. As with the Agreement, the Court grants the request to file the Amendment in redacted form.

Within three weeks of the date of this Order, Bloomberg shall file the Agreement in redacted form on the public docket and shall file an unredacted version under seal, and Plaintiffs shall do the same with the Amendment.

### IV. CONCLUSION

The motion to dismiss Plaintiffs' original complaint is denied as moot, and the motion to dismiss the amended complaint is granted as to the claims for consequential damages and to the extent that the breach of the implied covenant claim overlaps with the breach of contract claim, but denied on all other grounds. The attendant requests for oral argument are also denied. This

resolves Docket Numbers 15, 18, 33, and 36. An initial pretrial conference is hereby scheduled for May 11, 2018, at 3pm. The materials described at Docket Number 19 are due seven days before the conference.

SO ORDERED.

Dated: March 27, 2018
New York, New York

_____
ALISON J. NATHAN
United States District Judge