UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

APR 17 2019

Optima Media Group Limited, *et al.*,

Plaintiffs,

17-cv-1898 (AJN)

—v—

OPINION & ORDER

Bloomberg L.P.,

Defendant.

ALISON J. NATHAN, District Judge:

This case arises from a contract between Optima Media Group Limited ("Optima") and

Optima Sports Management International (UK) Limited ("Optima Sports") and Bloomberg L.P.

("Bloomberg"). Bloomberg contracted with Optima to produce and distribute Africa-specific

business news programming. Optima Sports served as Optima's guarantor. After Bloomberg

terminated the contract, Optima and Optima Sports sued. Bloomberg counterclaimed,

contending that Optima and Optima Sports breached the contract, that Bloomberg was

fraudulently induced to enter the contract, and that Optima used Bloomberg's trademarks

without authorization. Optima has moved to dismiss these counterclaims on several grounds.

For the reasons explained below, Optima's motion is granted in part and denied in part.

**I. Background**

The Court takes the following facts from Bloomberg's Answer ("Ans."), Dkt. No. 49, and

its Amended Counterclaims ("Am. Counter."), Dkt. 58. The Court also considers the January

2012 contract at issue in this case (the "Agreement"), a May 2012 amendment to the Agreement

(the "Amendment"), and a press release that Bloomberg incorporated in its Answer. *Harris v.*

*Coleman*, 863 F. Supp. 2d 336, 341 (S.D.N.Y. 2012) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the counterclaim, documents attached to the counterclaim as exhibits, and documents incorporated by reference in the complaint." (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir.2010) (internal brackets omitted)).

Bloomberg is a media company that produces television programming and distributes content, with a principal place of business in New York.  Agreement at 1; Am. Counter. ¶ 2. Optima is a Nigerian media company with a principal place of business in Lagos, Nigeria. Am. Counter. ¶ 3.  Optima Sports is an English Corporation and has its principal place of business in London, England. *Id.* ¶ 4.  Bloomberg sought to contract with Optima to produce Africa-related business news and to distribute that content, along with other Bloomberg television programming, in Africa.  Bloomberg alleges that leading up to the execution of the January 2012 contract between the parties (the "Agreement"), Optima represented to Bloomberg that "it was financially solvent and fully capable of assuming responsibility for the production, administration, and management necessary to offer live programming meeting Bloomberg brand standards." *Id.* ¶ 8.  Optima also allegedly presented itself as having experience in the acquisition and distribution of television channels and satellite programming. *Id.*  Bloomberg alleges that during the course of negotiations it relied on Optima's claims. *Id.* ¶ 9.

A. **The Agreement**

In January 2012, the parties signed the Agreement, contracting "to create original live programming with the editorial, technical and substantive style of BTV" that would be branded as "Bloomberg West Africa" and distributed into certain African markets. Agreement at 1. Under the Agreement, on or before June 30, 2012, Optima would produce "a live weekday programming window or windows of not more than four (4) hours per day in duration ('the

2

Channel Window')" that would consist primarily of business news, general news, and current affairs programming for a West African audience.  Agreement ¶¶ 1(a)(i), 1(a)(iv)(a).  As to the Channel Window, Optima was responsible for "all production and administration," "management of al day-to-day operations," "payment of all 'set up' and maintenance costs," and "such other administrative functions as are customary for the operation of a channel or programming similar to the Channel Window." Agreement ¶¶ 1(a)(ii)(b)(i), (ii), (xii), 1(a)(ii)(a). Optima agreed to obtain and maintain, at its own expense "any and all rights, licenses, approvals, clearances, releases, [and] local[] and international authorizations" necessary to perform its contractual obligations and to operate its business under the Agreement. Agreement ¶ 12(b)(iv), (1)(a)(ii)(b)(xi); Amendment ¶ 2.  Optima also represented that it would comply with all applicable laws with respect to its rights and obligations under the Agreement. Agreement ¶ 12(b)(v).  Finally, Optima generally represented that it would "fulfill its obligations to Bloomberg . . . [as] set forth in the Agreement." Agreement ¶ 12(b)(i).

The Agreement also contained a number of provisions on the use of Bloomberg's marks, names, and other intellectual property, including "'Bloomberg,' 'Bloomberg Television,' and 'BTV,' and any variations or derivatives thereof." Agreement ¶ 9; Am. Counter. ¶ 13.  Optima was prohibited from using these marks in any manner that "would tend to devalue, injure or dilute the goodwill or reputation of Bloomberg, its Affiliated Companies, its licensors or the Bloomberg Marks." Agreement 4(b)(ii). The Agreement also required that Optima strictly adhere to the Bloomberg Editorial Code of Ethics, that programming be consistent with Bloomberg's journalistic integrity and standards, and that the programming not be inappropriate or embarrassing to Bloomberg.  Agreement ¶¶ 1(a)(ii)(b)(viii), 1(a)(iii)(b), 2, 2(b), 2(c).  Upon termination of the Agreement, Optima's rights to Bloomberg's marks would terminate

3

immediately and Optima was required to immediately cease representing to the public any affiliation with Bloomberg in connection with the Agreement.  Agreement ¶ 8(b)(iv).

### B. Optima and Optima Sport's Alleged Failures to Perform

Under the Agreement, Optima was to begin producing content by June 2012, but it did not begin doing so until at least November 2013. Am. Counter. ¶ 21.  Bloomberg alleges that Optima never produced a live weekday programming window on a weekly basis with the "editorial, technical, and substantive style" of Bloomberg Television. *Id.* (quoting Agreement ¶ 1(a)(i); Agreement at 1).  This was allegedly attributable in large part to Optima's persistent failure to make payments to its staff, as well as vendors, governments, and other third parties. *Id.* ¶ 22.  This led to a host of problems, which Bloomberg details at length: work stoppages and staff departures, loss of access to content, cancellation of programming, threats of lawsuits by unpaid vendors, unpaid taxes, and other delays. *Id.* ¶¶ 23-37.  Some of these affected Bloomberg directly, such as Optima's failure to pay hundreds of thousands of dollars in fees Bloomberg had invoiced and the cancellation of an interview that Bloomberg had helped to arrange. *Id.* ¶¶ 30, 35-36.

Bloomberg also alleges that Optima failed to comply with the Nigerian regulatory process and obtain the requisite approvals for the exchange of large amounts of foreign currency. *Id.* ¶ 39.  This was despite the fact that "other commercial entities" in Nigeria were able to perform foreign exchange transactions and convert currency. *Id.* ¶ 40.  Optima's inability to convert currency was part of the reason for its failure to pay its staff and vendors. *Id.* ¶ 39. Optima also failed to obtain approvals to shoot in certain public areas but did so anyway. *Id.* ¶ 41.  Finally, Bloomberg received complaints that persons affiliated with Optima were benefiting financially from stories that they produced and Bloomberg was informed by third parties that Optima had "developed a poor reputation" and that there were concerns over the quality of

Bloomberg TV Africa. *Id.* ¶¶ 42-43.

Bloomberg terminated the Agreement on May 7, 2015. *Id.* ¶ 47. Weeks after this termination, Bloomberg received information from an Optima employee, Richard Harrison, detailing Optima's outstanding debts, allegations of fraud against Optima's CEO, and purported pending government investigations into Optima. *Id.* ¶ 48.

For at least seven months after the termination of the Agreement, Optima continued to use several communication channels that included the Bloomberg name including: www.bloombergtvafrica.com; www.bloomberg-optimamedia.com; the email address for Bloomberg-optimamedia.com; a Facebook page for Bloomberg TV Africa ("btvafrica"); a btvafrica YouTube page; and a @bloombergtvafri Twitter feed. Am. Counter. ¶53-54. Bloomberg sent Optima several cease and desist letters regarding Optima's use of the registered marks "Bloomberg" and "BTV." Am. Counter. ¶¶ 56-57. Bloomberg also petitioned Youtube and Facebook to take down the allegedly infringing pages. Am. Counter. ¶ 55. Optima continues to operate a live YouTube page entitled "BTVA Newsroom," a live Facebook account called "BTVA Newsroom," a live Instagram page named "@btvanewsroom," and a live Twitter feed at "@btvanews." Am. Counter. ¶ 58. Each of these bears "an orange logo evocative of Bloomberg's brand, and each display[s] on-screen visual elements belonging to Bloomberg." Am. Counter. ¶ 58. Bloomberg alleges that Optima's actions have undermined goodwill towards Bloomberg and its reputation for quality broadcasting, as well as deterred potential Bloomberg licensees.

## II. Legal Standard

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a claim in a complaint." *Dentsply Int'l Inc. v. Dental Brands for Less LLC*, No. 15-cv-8775 (LGS), 2016 WL 6310777, at *2 (S.D.N.Y. Oct. 27, 2016) (citing *Keep on Kicking Music,*

*Ltd. v. Hibbert*, No. 15-cv-7464 (WHP), 2016 WL 4386047, at *2 (S.D.N.Y. Aug. 17, 2016)). To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim achieves "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, and if plaintiffs cannot "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed," *Twombly*, 550 U.S. at 570. "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). When considering a motion to dismiss under Rule 12(b)(6), "a court must accept as true all of the [factual] allegations contained in [the] complaint." *Iqbal*, 556 U.S. at 678. However, the court should not accept legal conclusions as true: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## III. Discussion

### A. Bloomberg's Fraudulent Inducement Counterclaim is Dismissed

Bloomberg claims that Optima fraudulently induced Bloomberg into entering the Agreement. Bloomberg alleges that while negotiating the Agreement, Optima head Rotimi Pedro and his advisors made a series of misrepresentations about Optima's solvency, sophistication, and capacity. Bloomberg alleges that it relied on these misrepresentations to its detriment. Optima challenges that Bloomberg (1) has not alleged its fraudulent inducement counterclaim with sufficient particularity, (2) that Bloomberg has not sufficiently alleged scienter

or reasonable reliance, (3) and that Bloomberg has not alleged actual harm. For the reasons given below, the Court concludes that Bloomberg's allegations are insufficiently specific and therefore does not address the latter two issues.

Under Fed. R. Civ. P. 9(b), "a party must state with particularity the circumstances constituting fraud." To meet this standard, Bloomberg must set forth "'the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 39 F. Supp. 3d 516, 520 (S.D.N.Y. 2014) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)); *see also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) ("This Court has read Rule 9(b) to require that a complaint (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." (internal citations omitted)). "The purpose of Rule 9(b) is threefold—it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991). The Second Circuit has made clear that it "recognize[s] and rigorously enforce[s] these salutary purposes of Rule 9(b)." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26 (2d Cir. 2016) (internal quotation marks omitted). Nonetheless, while specificity is required, "a plaintiff need not plead dates, times, and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based." *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 516 (S.D.N.Y. 2016) (quoting *Rana v. Islam*, 305 F.R.D. 53, 58 (S.D.N.Y.2015)). The Court now turns to whether Bloomberg's allegations satisfy this standard.

As to who made the alleged misrepresentations, Bloomberg only points to a mostly

7

nameless group of indeterminate number.  Bloomberg alleges that the misrepresentations were

made by "Optima's head, Rotimi Pedro, and his principal advisers."  Am. Counter. ¶¶ 61, 85.

The inclusion of Rotimi Pedro's name does little to render the allegations more specific, since

Bloomberg does not indicate which statements were made by Rotimi Pedro and which were

made by the undefined group of advisors.  Absent any information on the identities, positions,

and number of such advisors, Bloomberg has failed to "identify the speakers." *See Mills v. Polar*

*Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the

complaint vaguely attributes the alleged fraudulent statements to 'defendants.'" (citing cases));

*Schlenger v. Fid. Emp'r Servs. Co., LLC*, 785 F.Supp.2d 317, 352 (S.D.N.Y.2011) (allegations

that statements were made by "[company] representatives" were overly general).  Bloomberg

argues that failure to specify which defendant was the speaker did not prove fatal in cases

involving two named defendants one of which was a "single purposed entity that was closely

held" by the other of the two named defendants.  *Minnie Rose*, 169 F. Supp. 3d at 518 (citing

*Buyers & Renters United to Save Harlem,  v. Pinnacle Group N.Y. LLC*, 575 F. Supp. 2d 499,

508 n.3 (S.D.N.Y. 2008)).  Yet here Bloomberg fails to allege that Optima was closely held[1] and

does not provide even an estimate of the number of "principal advisers." This Court's decision in

*Luv N' Care, Ltd. v. Shiboleth LLP* is similarly of little help to Bloomberg, as in that case the

plaintiff, over the course of "multiple pages and dozens of paragraphs," alleged specific false

statements made by the individual defendant and quoted the allegedly false statements made by

the defendant entity on its website. No. 16-CV-3179 (AJN), 2017 WL 3671039, at *11

---

[1] Bloomberg states in its brief that "Optima is a small entity, tightly controlled by its chairman, Rotimi Pedro, with assistance from a small handful of associates." Bloom. Mot. Opp. at 20. However, the Court will not credit unpled allegations made in a party's brief. *See Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y.), *aff'd*, 157 F. App'x 398 (2d Cir. 2005) (citing cases).

(S.D.N.Y. Aug. 8, 2017).  Bloomberg therefore fails to specify who made the alleged misrepresentations.

This failure is compounded by the absence of any allegation as to where and how these statements were made.  Bloomberg only alleges in quite general terms that the misrepresentations occurred "in a series of communications." Am. Counter. ¶¶ 61, 85. Bloomberg argues that its allegations must be sufficient, since courts have found it sufficient to state that misrepresentations occurred in a certain city, *Rana*, 305 F.R.D. at 58, or on a phone call, *Luv N' Care,* 2017 WL 3671039, at *11.  Yet Bloomberg does not identify the continent, much less the city, in which the communications were made.  Nor does Bloomberg offer an estimate of the number of such communications, or whether they were made "in person, over the phone, or by email." *CapLOC*, 2018 WL 3407708, at *10.  Bloomberg's allegations thus fail to specify the "where" or the "how" of the alleged misrepresentations.

Finally, as to timing, Bloomberg only alleges in its pleading that the misrepresentations occurred "up to and including on January 1, 2012" and "during [Optima's] negotiations with Bloomberg." Am. Counter. ¶¶ 60-61, 85.  This inexact and open-ended period is not sufficiently specific to satisfy Rule 9(b).  *See CapLOC*, 2018 WL 3407708 at *10 (allegation that misrepresentations took place "over the course of several months" was insufficiently specific). Bloomberg, in its brief, argues that the time period should be treated as two months, because Optima alleged in its Amended Complaint that negotiations over the contract only began in November of 2011.  Bloom. Mot. Opp. at 20 (citing Amend. Compl. ¶ 23).  Yet, as Optima points out, Bloomberg's Answer actually denied this particular allegation. Ans., Dkt. 49, ¶ 23. The Court declines to credit Bloomberg's reliance in its briefing on a fact not in its pleadings, *Radiancy, Inc. v. Viatek Consumer Prod. Grp., Inc.*, 138 F. Supp. 3d 303, 316 (S.D.N.Y. 2014),

*as amended* (Apr. 1, 2014) ("Facts not contained in the Complaint, or here, Counterclaim, cannot be considered in determining the sufficiency of the pleadings on a motion to dismiss."), particularly one that would, in fact, be inconsistent with its own pleadings, *Pierce v. Fordham Univ., Inc.*, No. 15-cv-4589 (JMF), 2016 WL 3093994 n.1, at *2 (S.D.N.Y. June 1, 2016), *aff'd*, 692 F. App'x 644 (2d Cir. 2017) ("It is well established that, where a [party's] own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss." (internal quotation marks omitted)). Bloomberg's allegations therefore fail to specify the "when" of the alleged misrepresentations.

Applying Rule 9(b)'s requirements rigorously, as the Second Circuit has instructed, Bloomberg's failure to specify the speakers is problematic in itself. *See Mills*, 12 F.3d at 1175 (Rule 9(b) not satisfied based on failure to identify speakers); *see also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir. 1993) (declining to "sanction[] the pleading of fraud through completely unattributed statements, even when the plaintiff alleges on information and belief that the unattributed statement was made by an agent of the defendant"). Taken in conjunction with the failure to specify the location, method of communication, and precise time frame, Bloomberg's claim cannot satisfy Rule 9(b). *See Schlenger v. Fid. Emp'r Servs. Co., LLC*, 785 F.Supp.2d 317, 352 (S.D.N.Y.2011) ("Plaintiff's failure to name individuals, identify detailed statements, or identify particular dates makes clear that as pleaded this claim lacks the specificity required by Rule 9." (citing cases)); *Armored Grp., LLC v. Homeland Sec. Strategies, Inc.*, No. 07-cv- 9694 (LAP), 2009 WL 1110783, at *1 (S.D.N.Y. Apr. 21, 2009) (claim did not satisfy Rule 9(b) because plaintiff "does not specifically identify the location where the misrepresentations were made," "does not provide exact dates for the statements," and "fails to

sufficiently identify 'who' the speaker is concerning each statement"); *Ben Hur Moving &*
*Storage, Inc. v. Better Bus. Bureau*, 08-cv-6572 (JGK), 2008 WL 4702458, at *4 (S.D.N.Y. Oct.
3, 2008) ("The plaintiff's complaint fails [the Rule 9(b)] standard because the allegations in the
complaint do not specify the time, place, speaker, or the content of the misrepresentations that
were allegedly made through the mails and over the Internet."). Therefore, the Court dismisses
Bloomberg's counterclaim for fraudulent inducement.

  While dismissal under Rule 9(b) is "almost always accompanied by a grant of leave to
amend," such leave is not necessary if the claimant "has had a prior opportunity to amend its
complaint." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 581 (2d Cir. 2005)
(internal quotation marks omitted). In this case, Optima's first motion to dismiss Bloomberg's
initial counterclaims raised a similar challenge under Rule 9(b). Dkt. 54, at 22-23.
Furthermore, Bloomberg has not presented anything to suggest that it "could amend the
complaint to adequately plead" its counterclaim under Rule 9(b), *In re Time Warner*, 9 F.3d at
266, nor has it requested opportunity to amend, *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir.
2011) ("no court can be said to have erred in failing to grant a request that was not made").
Therefore, the Court dismisses this claim with prejudice.

**B. The Court Grants Plaintiff's Motion to Dismiss Bloomberg's Trademark
Counterclaims in Part and Denies it in Part**

  In the counterclaim complaint, Bloomberg alleges that Optima violated the Lanham Act
and New York common law through its unauthorized post-termination use of the Bloomberg
brand on websites and social media accounts, as well as the use of on-screen visual elements that
"match the look and feel of Bloomberg television." Am. Counter. ¶¶ 54-59, 79-82. Optima
moves to dismiss, arguing that Bloomberg has not sufficiently alleged facts that would warrant
the extraterritorial application of the Lanham Act and New York common law to Optima's

actions outside of the United States. The Court will analyze Bloomberg's Lanham Act and common law claims in turn. For the reasons below, the Court agrees with Optima that even drawing all reasonable inferences in Bloomberg's favor, it has failed to sufficiently allege facts warranting the extraterritorial application of the Lanham Act. However, the Court further concludes that it would be premature to dismiss Bloomberg's New York common law claims at this juncture.

### 1. Bloomberg's Lanham Act Counterclaims are Dismissed

In *Vanity Fair Mills, Inc. v. T. Eaton Co.*, the Second Circuit established a three-part test for determining whether the Lanham Act applies outside of the United States. 234 F.2d 633, 642-43 (2d Cir. 1956). The court is to consider "(1) whether the defendant was a United States citizen, (2) whether the defendant's conduct had a substantial effect on United States commerce, and (3) whether there was a conflict with trademark rights established under foreign law." *Totalplan Corp. of Am. v. Colborne*, 14 F.3d 824, 830 (2d Cir. 1994) (citing *Vanity Fair*, 234 F.2d at 642-43). In balancing these factors, "at least any two of the three factors must be satisfied before a court will apply the Lanham Act extraterritorially." *NewMarkets Partners LLC v. Oppenheim*, 638 F. Supp. 2d 394, 406 (S.D.N.Y. 2009) (citing *Totalplan*, 14 F.3d at 831). The Court addresses each factor in turn.

#### a. The First Vanity Fair Factor Weighs Against Applying the Lanham Act Extraterritorially

The first factor, citizenship, weighs against applying the Lanham Act here. Both Optima and Optima Sports are foreign citizens, Am. Counter. ¶¶ 3-4, 6, which counts against applying the Lanham Act, *Totalplan*, 14 F.3d at 830 (where none of the appellees was a United States citizen, citizenship factor weighed against applying the Lanham Act). Bloomberg seeks to avoid this straightforward conclusion by arguing that because Optima consented in the Agreement to

12

adjudicate claims in New York and because this Court will still have to adjudicate Optima's other claims, the citizenship factor actually counts in favor of applying the Lanham Act here. Bloom. Mot. Opp. at 15-16. Yet courts in this circuit have been reluctant to find that the citizenship factor counts in favor of applying the Lanham Act extraterritorially to foreign defendants absent "other factors . . . which justified treating that defendant as a U.S. citizen, such as the defendant's residence in the United States or exercise of considerable control over a U.S. corporation engaging in infringing activities." *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 506 (S.D.N.Y. 2013) (citing cases). *Warnaco Inc. v. VF Corp*, on which Bloomberg relies heavily, is not to the contrary. 844 F. Supp. 940 (S.D.N.Y. 1994). The defendants in *Warnaco* were an American company and a foreign-owned company that was allegedly a wholly-owned subsidiary of the American defendant. *Id.* at 952. While *Warnaco* found that the citizenship factor weighed in favor of extraterritorial application of the Lanham Act, the factual situation in *Warnaco* is squarely in line with *Juicy Couture*'s description of the caselaw, since an American corporation was exercising considerable control over the foreign defendant. It is true that in *Warnaco*, the court found that a New York venue choice provision in the relevant contract, as well as the fact that the court had other non-Lanham Act claims before it involving the same foreign defendant, were additional reasons to apply the Lanham Act extraterritorially. *Id.* However, it did not find that these two reasons would be sufficient in and of themselves for a foreign defendant to be treated as equivalent to a U.S. citizen for the purposes of the *Vanity Fair* citizenship analysis. *Id.* Finally, as to the choice of law clause in this case, it refers to "any applicable federal laws of the United States," Agreement ¶ 14(c), which does not in itself resolve the question of whether the Lanham Act is, in fact, applicable to the extraterritorial conduct at issue. Therefore, the citizenship factor weighs against applying the Lanham Act here.

### b.  The Second *Vanity Fair* Factor Weighs in Favor of Applying the Lanham Act Extraterritorially

As to the second factor, Optima does not dispute this factor and Bloomberg's pleadings

offer no indication that Optima acted "under presumably valid trade-marks in a foreign country."

*Vanity Fair*, 234 F.2d at 643.  This factor thus weighs in Bloomberg's favor.

### c.  The Third *Vanity Fair* Factor Weighs Against Applying the Lanham Act Extraterritorially

The *Vanity Fair* test thus comes down to the substantial relationship factor.  Bloomberg

alleges two substantial relationships with commerce in the United States: (1) Optima's use of

Bloomberg's marks has diminished the value of Bloomberg's U.S. brand for would-be foreign

licensees, and (2) Optima's use of the marks has caused confusion and harm to Bloomberg's

reputation among U.S. consumers.[2]  Bloom. Mot. at 13-15.  Optima counters that Bloomberg has

failed to sufficiently allege either.  The Court agrees with Optima that Bloomberg's allegations

are insufficient to "nudge[] [its] claims across the line from conceivable to plausible." *Twombly*,

550 U.S. at 570.

As to Bloomberg's first alleged substantial relationship, Bloomberg's allegations of an

effect on foreign licensees are too conclusory to state a plausible claim.  In certain circumstances

"adverse impact on foreign licensees can constitute substantial impact on United States

commerce." *Warnaco*, 844 F. Supp. at 951–52.  However, for this factor to weigh in

Bloomberg's favor, "there must be a 'substantial' effect—not merely 'some' effect." *Aerogroup*

---

[2] In a footnote, Bloomberg contends that it has also adequately pled a trademark dilution
claim.  Independently of the merits of such a claim, Bloomberg's allegations that this dilution
has had a substantial effect on United States commerce rest on the same claims of harm as its
other trademark claims: damage to reputation and association with substandard content. Bloom.
Mot. Op. at 17 n. 6.  Therefore, the Court analyzes whether these allegations of a substantial
effect on U.S. commerce are sufficient under *Vanity Fair* simultaneously with Bloomberg's other
trademark claims.

*Int'l, Inc. v. Marlboro Footworks, Ltd.*, 955 F. Supp. 220, 229 (S.D.N.Y. 1997), *aff'd*, 152 F.3d

948 (Fed. Cir. 1998) (quoting *Totalplan*, 14 F.3d at 830)). Bloomberg only levies the vague

allegation that Optima's use of the marks: "deters international counterparties from negotiating

licensing agreements with Bloomberg for the use of its American-held trademarks, and at a

minimum diminishes the value of Bloomberg's brand to would-be licensees." Am. Counter. ¶

59. This allegedly has an effect in the United States, since Bloomberg's licensing relationships

are managed from the United States. Bloom. Mot. Opp. at 13-14. Yet these allegations are no

more than conclusory. *Iqbal*, 556 U.S. at 686 (courts are not required to credit conclusory

statements). Bloomberg does not specify any potential licensees, any plans Bloomberg has to

seek out such licensees, the impairment of any actual efforts to seek out licensees, or any existing

authorized licensees who may be harmed. *See Charisma World Wide Corp., S.A. v. Avon Prod.

Inc.*, 243 F. Supp. 3d 450, 458-59 (S.D.N.Y. 2017) (allegations of substantial effect based on

limitation, jeopardization, or loss of contracts were merely conclusory in part because the

contracts were not specified). Furthermore, even drawing reasonable inferences in Bloomberg's

favor, these vague, unspecified allegations do not make out a sufficiently *substantial* effect. *See

Aerogroup Int'l*, 955 F. Supp. at 229. Bloomberg's conclusory allegations about foreign

licensees are therefore insufficient to allege a substantial effect on U.S. commerce.

Bloomberg's second alleged substantial effect, consumer confusion and loss of goodwill

among U.S. consumers, presents a closer question. "[A] showing of consumer confusion or

harm to plaintiff's goodwill in the United States is sufficient to demonstrate a 'substantial effect

on United States commerce.'" *Gucci Am., Inc. v. Guess?, Inc.*, 790 F.Supp.2d 136, 143

(S.D.N.Y.2011) (citing cases). Bloomberg alleges that Optima's websites and social media

accounts—which include the terms "Bloomberg" or "BTV", as well as design similarities like an

orange logo—would confuse and diminish the goodwill of U.S. consumers who viewed them "through the Internet or while travelling in Africa." Am. Count. ¶¶ 58-59. Yet even drawing all reasonable inferences in Bloomberg's favor, these are insufficient to plausibly allege a sufficiently substantial relationship to U.S. commerce. Bloomberg never alleges that it has received any reports of U.S. consumers actually viewing these sites, or even that U.S. consumers viewed these sites at all, whether online or while traveling. *Id.* Nor does Bloomberg allege any facts that would make it plausible that these sites were, in fact, viewed by U.S. consumers. For example, Bloomberg does not allege how many views these websites or social media feeds received, if any, much less how many views they received during the allegedly infringing period. Furthermore, Bloomberg's pleadings are silent as to the content that was actually broadcast or hosted on many of these platforms, simply listing the website addresses. *Id.* ¶ 54. The mere fact that these sites existed or continue to exist on the Internet makes it possible that U.S. consumers have viewed them, but it does not make it plausible. *See Charisma World Wide*, 243 F. Supp. 3d at 458 (finding substantial effect factor had not been met in part because of failure to allege that consumer confusion had any effect within the United States). Nor has Bloomberg plausibly alleged that the likelihood of consumer confusion or loss of goodwill would be sufficiently substantial. *See A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 126 F. Supp. 2d 328, 340 (S.D.N.Y. 2001) ("Where the likelihood of consumer confusion or harm to a plaintiff's reputation is not serious, however, the Second Circuit has refused to permit the extraterritorial application of the Lanham Act."); *Aerogroup Int'l*, 955 F. Supp. at 229. Without more, the bare allegation that these sites have "irreparably damaged Bloomberg directly, by undermining Bloomberg's goodwill and reputation for quality broadcasting" is impermissibly conclusory. *Int'l Diamond Importers, Inc. v. Med Art, Inc.*, No. 15-cv-4045 (KMW), 2017 WL 2839640, at

*8 (S.D.N.Y. June 29, 2017) ("Plaintiff merely states that Defendant's actions caused 'substantial and irreparable harm to Plaintiff,' . . . without demonstrating this effect with any particularity, let alone a 'substantial' effect on United States commerce."); *see generally Iqbal*, 556 U.S. at 686. Therefore, Bloomberg's allegations regarding effect on U.S. consumers are insufficient.

None of the cases that Bloomberg cites—most of which were decided prior to the Supreme Court's decisions in *Twombly* and *Iqbal* regarding pleading standards—are to the contrary. Bloomberg again relies heavily on the decision in *Warnaco*, 844 F. Supp. at 950–52. Yet *Warnaco* involved a long list of concrete allegations describing in detail how the infringement affected the trademarks in question and the plaintiff's sales, rather than the speculative and conclusory allegations here. *Id.* at 944–45. Other cases all involved considerably more concrete interactions with the United States. *King v. Allied Vision*, 807 F. Supp. 300, 307 (S.D.N.Y.), *aff'd in part, rev'd in part sub nom. King v. Innovation Books, a Div. of Innovative Corp.*, 976 F.2d 824 (2d Cir. 1992) (the "false attribution occurred in the United States" and a U.S. agent was also involved in the infringing activities overseas); *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 171 (S.D.N.Y. 1998) (defendant engaged in scheme to invite purchasers to U.S. showrooms to purchase jeans for unrestricted international distribution); *Steele v. Bulova Watch Co.*, 344 U.S. 280, 284-87 (1952) (the infringing goods entered the United States and plaintiff heard complaints from customers in the United States who bought counterfeit watches). Finally, this Court declines to adopt a rule under which a party has alleged a substantial relationship to U.S. commerce simply by alleging that infringement has taken place on the internet. The Court therefore concludes that Bloomberg has failed to sufficiently allege that Optima's alleged infringement had a substantial effect on United States

commerce.

Weighing the *Vanity Fair* factors, the Court holds that Bloomberg has failed to allege sufficient facts to warrant the extraterritorial application of the Lanham Act. When two out of the three *Vanity Fair* factors are not met, courts will not apply the Lanham Act extraterritorially. *NewMarkets*, 638 F. Supp. 2d at 406 (at least two factors must be satisfied under *Vanity Fair* to apply the Lanham Act extraterritorially) (citing *Totalplan*, 14 F.3d at 831); *Vanity Fair*, 234 F.2d at 643 (absence of two factors was "fatal"). Indeed, even the lack of a substantial effect standing alone might itself be sufficient to defeat the application of the Lanham Act. *See Rodgers v. Wright*, 544 F. Supp. 2d 302, 313 (S.D.N.Y. 2008) ("[T]he Second Circuit has noted that it has *never* applied the Lanham Act to extraterritorial conduct absent a substantial effect on U.S. commerce." (emphasis in original) (citing *Atl. Richfield Co. v. Arco Globus Int'l Co.*, 150 F.3d 189, 192 n.4 (2d Cir.1998)). Therefore, the Court dismisses Bloomberg's Lanham Act claims. As above, Bloomberg had the chance to amend its counterclaims once already, in response to Optima's initial motion to dismiss, which raised similar arguments regarding the extraterritorial application of the Lanham Act. Dkt. 54, at 15-18. Moreover, because Bloomberg has not requested the opportunity to amend, dismissal of this claim is with prejudice. *See Gallop*, 642 F.3d at 369.

### 2. Optima's Motion to Dismiss Bloomberg's New York Common Law Claims Is Denied

Optima also moves to dismiss Bloomberg's New York common law claims. Optima argues that New York's presumption against the extraterritorial application of state law bars Bloomberg's claims. *See Glob. Reinsurance Corp. U.S. Branch v. Equitas Ltd.*, 18 N.Y.3d 722, 735 (2012). Bloomberg counters that the choice-of-law provision in the Agreement means that Optima has consented to the application of New York law to this dispute. *See Warnaco*, 844 F.

Supp. at 953. Because the language of the Agreement regarding choice of law is ambiguous, the Court holds that it would be premature to dismiss this counterclaim at this stage.

The relevant section of the Agreement reads as follows: "This Agreement and the legal relations among the parties hereto shall be governed by and construed in accordance with the laws of the State of New York regardless of the laws that might otherwise govern under applicable choice-of-law provisions." Agreement ¶ 14(c). The Court concludes that the language is ambiguous. Specifically, whether "the legal relations among the parties hereto" language includes the dispute over Optima's alleged post-termination use of Bloomberg's names and marks. Given that ambiguity, the question of whether the choice-of-law clause would allow for the application of New York common law to Optima's actions abroad cannot be resolved on this motion to dismiss. *Pujals v. Standard Chartered Bank*, 533 F. App'x 7, 10 (2d Cir. 2013) ("The meaning of an ambiguous contract, however, is a question of fact, which cannot be resolved by the court on a motion to dismiss."); *see also Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004). Optima's motion to dismiss Bloomberg's claims under New York common law is therefore denied.

### C. Bloomberg's Breach of Contract Counterclaims Are Dismissed in Part

Turning to Bloomberg's breach counterclaims, to state such a claim under New York law, a party must allege the following elements: "[a] the existence of a contract, [b] performance by the party seeking recovery, [c] non-performance by the other party, and [d] damages attributable to the breach." *Saeco Vending, S.P.A. v. Seaga Mfg.*, Inc., No. 15-cv-3280 (AJN), 2016 WL 1659132, at *7 (S.D.N.Y. Jan. 28, 2016) (quoting *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*, 156 F. App'x. 349, 350–51 (2d Cir. 2005)). Bloomberg alleges that Optima breached the Agreement in four principal ways: (1) failing to produce the required programming on or before June 30, 2012, as required by the Agreement, and thereafter failing to produce

programming that met the standards specified in the Agreement, Am. Counter. ¶¶ 74-75; (2) failing to pay staff and vendors and failing to properly equip its staff and facilities, resulting in a failure to adequately produce, administer, or manage the Channel Window, Am. Counter. ¶¶ 70-71; (3) failing to obtain the government licenses and approvals required by the Agreement, ¶¶ 72-73; and (4) breaching the sections of the Agreement regulating the use of Bloomberg's marks both pre- and post-termination of the Agreement, ¶¶ 76-77.  Optima argues that Bloomberg has failed to state a claim as to each of these four alleged breaches.  In addition, Optima argues (5) that Bloomberg has failed to state a claim for breach of contract against Optima Sports specifically and (6) that Bloomberg has failed to sufficiently plead that it would be entitled to lost licensing fees post-termination of the Agreement.  The Court will address Optima's arguments in turn.

### 1.  The Issue of Waiver Cannot be Resolved at this Stage

As to Bloomberg's first breach allegation, Am. Counter. ¶¶ 74-75, Optima argues that Bloomberg, by continuing to accept benefits under the Agreement, waived any ability to sue over Optima's failure to meet its June 30, 2012, production deadline.  Bloomberg responds that it would be improper for the Court to decide this issue on a motion to dismiss.  The Court agrees with Bloomberg.

Under New York law, "[c]ontractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006).  Waiver "may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage . . . and must be based on a clear manifestation of intent to relinquish a contractual protection." *Natale v. Ernst*, 63 A.D.3d 1406, 1407-08 (3rd Dep't 2009) (quoting *Fundamental Portfolio*, 7 N.Y.3d at 104) (internal quotation marks omitted)).  This is a high standard and "a party's reluctance to

terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent party's rights in the future." *See AM Cosmetics, Inc. v. Solomon*, 67 F. Supp. 2d 312, 318 (S.D.N.Y. 1999) (quoting *Seven–Up Bottling Co. Ltd. v. PepsiCo, Inc.*, 686 F.Supp. 1015, 1023, (S.D.N.Y.1988)).  Given the importance of intent to this determination, "New York law contains a 'general rule . . . that questions of waiver are not decided on a motion to dismiss.'" *Eastman Chem. Co. v. Nestle Waters Mgmt. & Tech.*, No. 11-cv-2589 (JPO), 2012 WL 4474587, at *2–3 (S.D.N.Y. Sept. 28, 2012) (quoting *CreditSights, Inc. v. Ciasullo*, 05-cv-9345 (DAB), 2007 WL 943352, at *9 (S.D.N.Y. March 29, 2007)). There is an exception to this general rule only when "waiver is clear on the face of the complaint" and thus can be "determined as a matter of law." *Id.* (quoting *Schonberger v. Serchuck*, 742 F.Supp. 108, 114-15 (S.D.N.Y. 1990)).

It is not clear on the face of the pleadings that Bloomberg showed a clear manifestation to relinquish the contractual provision in question.  It is true that even after Optima missed the June 30, 2012, production deadline, Bloomberg made a public announcement of its partnership with Optima and continued to receive significant benefits under the Agreement. Opt. Mot. Rep. at 5. Yet drawing all reasonable inferences in Bloomberg's favor, its conduct is also consistent with showing patience while encouraging Optima to fulfill its contractual obligations.

Furthermore, the Agreement contains a provision disclaiming waiver unless "in writing and signed by the Parties." Agreement ¶ 14(d).  It is true that under New York law, "the existence of such a clause does not preclude a waiver of contractual rights." *Williams v. Buffalo Pub. Sch.*, No. 17-3483, 2018 WL 6536051, at *2 (2d Cir. Dec. 12, 2018) (citing *TSS-Seedman's, Inc. v. Elota Realty Co.*, 72 N.Y.2d 1024, 1027 (1988) and *Stassa v. Stassa*, 123 A.D.3d 804, 806 (2nd Dep't 2014)).  Nonetheless, the New York Court of Appeals has also

indicated that such a clause may preclude inferring waiver as a matter of law. *See Jefpaul Garage Corp. v. Presbyterian Hosp. in City of New York*, 61 N.Y.2d 442, 446 (1984) (finding that waiver could "certainly not" be inferred as a matter of law when a lease contained a no-waiver clause). This further precludes deciding this issue at this stage.

Therefore, in light of the general presumption against finding waiver on a motion to dismiss and the clause requiring a signed writing to effectuate waiver, the Court cannot conclude at this stage that Bloomberg's counterclaim is barred by waiver.

### 2.   Bloomberg Has Sufficiently Alleged that Optima Breached the Agreement by Failing to Pay Staff and Vendors

Turning to Bloomberg's second set of breach allegations, Am. Counter. ¶¶ 70-71, Optima argues that none of Bloomberg's allegations, such as failure to pay staff and vendors, plausibly violate express provisions of the Agreement. Opt. Mot. at 16. The Court disagrees.

Under the Agreement, Optima was responsible for "the payment of all 'set-up' and maintenance costs related [to the Channel Window]," "all production and administration of the Channel Window," "management of all day-to-day operations of the Channel Window," and "such other administrative functions as are customary for the operation of a channel or programming similar to the Channel Window." Agreement ¶¶ 1(a)(ii), (a)(ii)(b)(i), (ii), and (xii). Bloomberg alleges a long list of ways in which Optima's repeated failures to pay staff and vendors—in a timely manner or otherwise—caused disruptions in the production of programming. Am. Counter. ¶¶ 22-32, 45. These disruptions include cancellations, work stoppages, and loss of access to valuable content. *Id.* Bloomberg also alleges that Optima failed to adequately staff its studios or build a studio in accordance with the technical specifications of the Agreement. Am. Counter. ¶¶ 24, 45-46. Bloomberg argues that these failures undermined the core purpose of the Agreement, which was for Optima to "create original live programming

22

with the editorial, technical, and substantive style" of Bloomberg Television. Agreement at 1.

Drawing all reasonable inferences in Bloomberg's favor, Bloomberg has plausibly alleged that

Optima's failure to fully staff its facilities or build them in accordance with the Agreement's

specifications breached Optima's obligation to pay set-up and maintenance costs for the Channel

Window. Similarly, Bloomberg's allegations regarding Optima's failures to pay staff and

vendors, and the many disruptions that ensued, plausibly allege that Optima breached both the

requirement that Optima pay set-up and maintenance costs, as well as assume responsibility for

the day-to-day management and administration of the Channel Window in a manner that is

customary for such a project. This is sufficient to survive a motion to dismiss.

### 3. Bloomberg Has Sufficiently Alleged that Optima Breached the Agreement by Failing to Obtain Proper Licenses and Approvals

As to Bloomberg's third set of breach allegations, Am. Counter. ¶¶ 72-73, Optima argues

that the provisions in the Agreement requiring it to obtain the necessary government licenses and

approvals do not extend to the process for seeking approval to convert Nigerian currency into

foreign currency. The Court again disagrees.

Pursuant to the Agreement, Optima was required to "obtain, and . . . maintain, at its own

expense, any and all rights, licenses, approvals, clearances, releases, local, and international

authorizations necessary to perform its obligations under the Agreement and to operate the

business it is conducting in connection with its rights and obligations under the Agreement" and

to "obtai[n] and maintai[n] all necessary licenses, approvals, and consents from the relevant

government authorities." Agreement ¶¶ 12(b)(iv), 1(a)(ii)(b)(xi); Amendment ¶ 2. Bloomberg

alleges that Optima breached the Agreement by failing to comply with the Nigerian regulatory

process and obtain Nigerian Central Bank approvals required to convert significant sums of

Nigerian currency. This, Bloomberg alleges, was partly to blame for the non-payments and

resulting disruptions mentioned above. Optima counters that because companies do not "obtain

and maintain" the ability to exchange Nigerian currency, the above language in the Agreement

does not extend to the process of converting currency. Opt. Mot. at 17. Yet Optima's argument

is fundamentally a factual dispute about Bloomberg's characterization of the process for

exchanging Nigerian currency, which is unavailing on this motion to dismiss. In addition,

Optima does not address Bloomberg's allegations that Optima failed to obtain necessary permits

or licenses in creating some of its programming—such as obtaining approval to film in public

areas in the Middle East. The Court concludes that Bloomberg's allegations are sufficient to

survive a motion to dismiss.

### 4. Bloomberg Has Sufficiently Alleged that Optima Breached the Provisions of the Agreement Governing the Use of Bloomberg's Marks

Turning to Bloomberg's fourth set of breach allegations, Am. Counter. ¶¶ 76-77,

Bloomberg alleges that Optima breached the Agreement's limitations on the use of Bloomberg's

brand, marks, and other intellectual property by: (i) using these marks pre-termination in ways

that did not meet Bloomberg brand standards and reflected poorly on Bloomberg and its brand,

and (ii) continuing to use the marks post-termination. Optima moves to dismiss on several

grounds, none of which are availing.

First, prior to the termination of the Agreement, Optima was prohibited from using the

Bloomberg Marks "in any manner that would tend to devalue, injure or dilute the goodwill or

reputation of Bloomberg, its Affiliated Companies, its licensors, or the Bloomberg Marks."

Agreement ¶ 4(b)(ii). Bloomberg alleges that while creating content for the project Optima

failed to follow government regulations, that Bloomberg received complaints about violations of

ethics and editorial standards at Optima, and that Bloomberg was told Optima was developing a

bad reputation and there were concerns over the quality of Bloomberg TV Africa's

programming. Am. Counter. ¶¶ 41-43. Optima tries to argue that Bloomberg only alleges that *Optima's* reputation was damaged. Opt. Mot. Rep. at 6-7. Yet, drawing all reasonable inferences in Bloomberg's favor, Bloomberg has sufficiently pled that Optima's actions—which Optima took while acting as Bloomberg's African licensee and employing Bloomberg's marks—*tended* to devalue, injure, or dilute the goodwill or reputation of Bloomberg and its marks.

Second, upon the termination of the Agreement, Optima's right to use Bloomberg's marks under the Agreement terminated immediately. Agreement ¶ 8(b)(iv). Bloomberg alleges that despite this, Optima continued to use websites, social media accounts, and an email address, that contained "bloomberg," "btvafrica," and "BTVA." Am. Counter. ¶¶ 54-58. Optima, relying on a separate section of paragraph 8(b)(iv), counters that only use of the marks in a manner that relates to the "subject matter" of the Agreement is prohibited. Opt. Mot. at 18; Opt. Mot. Rep. at 6-7. Yet it is far from clear that the language Optima cites serves to limit the later language in the provision, which states without qualification that Optima's rights to use Bloomberg's marks ends immediately upon termination of the Agreement. And beyond the question of the validity of Optima's reading, the use of terms such as "bloombergtvafrica" and "BTVA" is clearly related to the subject matter of the Agreement. Finally, Optima's argument that "BTVA" did not constitute Bloomberg property under the Agreement is directly contradicted by the Agreement's text. Agreement ¶ 9(a) (Bloomberg owns the trademarks "Bloomberg," "Bloomberg Television," "BTV," and "any variations or derivatives thereof"). Therefore, Bloomberg has sufficiently pled a claim for breach based on Optima's post-termination actions.

For the reasons given above, Bloomberg has sufficiently alleged that Optima breached the Agreement by its use of Bloomberg's marks both pre- and post-termination.

### 5. Bloomberg's Counterclaims Against Optima Sports Are Dismissed in Part

Turning now to Optima Sports specifically, Optima argues that Bloomberg has failed to

25

identify any express provision of the Agreement relating to Optima Sports that Optima Sports has allegedly breached. The Court agrees with Optima in large part, with the exception of one provision of the Agreement setting out Optima's Sports' responsibilities as Guarantor.

The majority of Bloomberg's allegations against Optima Sports do not plausibly identify any provisions of the contract that Optima Sports has breached. Bloomberg does not differentiate between Optima and Optima Sports in its breach of contract counterclaims— confusingly using "Optima" as shorthand to refer to both. Amend. Count. at 1. And Bloomberg fails to identify how most of its allegations against Optima relate to Optima Sports' duties under the Agreement. As is relevant here, the Agreement only provides one duty to Optima Sports. Namely, if Optima fails to pay the licensing fees due under the Agreement, Optima Sports "shall ensure that such payments are made good to Bloomberg either by [Optima Sports] or by [Optima] itself." Agreement ¶ 10(d). This obligation of Optima Sport's is "more particularly described and governed by the Guaranty of even date signed by [Optima Sports] and Bloomberg." *Id.* Neither party has provided the Court with a copy of the Guaranty. As Optima points out, Bloomberg's allegations about, for example, staff non-payment or failure to obtain approval for filming are not related to the above language. These allegations cannot support a breach claim against Optima Sports.

Bloomberg's response is to advance an unavailable reading of the Agreement. According to Bloomberg, because the first paragraph of the Agreement that states Optima Sports will thereinafter be referred to as "the 'Guarantor,'" Optima Sports is liable without limitation or qualification for Optima's performance under the Agreement. This is not a credible reading of the plain language. The substance of this section of the first paragraph of the Agreement is simply to name and identify the parties, not set out their respective responsibilities. Agreement

at 1. Moreover, the content of Optima Sports' duties as Guarantor are explicitly spelled out in the Agreement, and the Court will therefore not engraft further, implied responsibilities. *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 131 (S.D.N.Y. 2015) (a court will not "supply a specific obligation the parties themselves did not spell out") (quoting *Tonking v. Port Auth. Of New York and New Jersey*, 3 N.Y.3d 486, 490 (2004)). Indeed, if all of Optima's responsibilities were also Optima Sports', then the provisions laying out Optima Sports' specific responsibility for licensing payments would be superfluous. *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'" (quoting *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir.1988)). Therefore, Bloomberg has failed to plausibly allege that Optima Sports breached provisions of the Agreement that do not refer to Optima Sports.

However, drawing all reasonable inferences in its favor, at this stage Bloomberg has plausibly alleged that Optima Sports breached its expressly-defined duties as Guarantor. Bloomberg alleges that Optima failed to make hundreds of thousands of dollars in required payments and fees. Am. Counter. ¶ 36. As Guarantor, Optima Sports was required to "ensure that [licensing] payments are made good to Bloomberg either by [Optima Sports] or by [Optima] itself." Agreement ¶ 10(d). Drawing all available inferences in Bloomberg's favor, and without the benefit of the Guaranty between the parties, the Court cannot conclude that, as a matter of law, Bloomberg has failed to state a claim against Optima Sports for failing to fulfill its duties as Guarantor.

For the reasons above, the Court dismisses Bloomberg's counterclaim for breach of contract against Optima Sports, except with respect to unpaid licensing fees.

**6.  Bloomberg Has Sufficiently Plead Damages for Lost Licensing Fees**

Finally, Optima moves the Court to dismiss Bloomberg's request for lost licensing fees for the period after the May 2015 termination of the Agreement. Am. Counter. ¶ 65. Optima challenges that Bloomberg's choice to terminate the Agreement caused these lost fees, not Optima's alleged breaches.

Under New York law, "to recover damages for lost profits, it must be shown that: (1) the damages were caused by the breach; (2) the alleged loss must be capable of proof with reasonable certainty, and (3) the particular damages were within the contemplation of the parties to the contract at the time it was made." *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 404 (1993). As to causation specifically, "[l]oss causation is causation in the traditional 'proximate cause' sense—the allegedly unlawful conduct caused the economic harm." *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir. 2000). "A proximate cause determination does not require a jury to identify the liable party as the sole cause of harm; it only asks that the identified cause be a substantial factor in bringing about the injury." *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000).

Optima contends that, as a matter of law, the loss of any post-May 2015 licensing fees was proximately caused solely by Bloomberg's decision to terminate the contract, not any breach by Optima. District courts have differed as to the legal merits of a similar argument in the context of franchise agreements. *Compare ATC Healthcare Servs., Inc. v. Pers. Sols., Inc.*, No. 01-cv-762 (CBA), 2006 WL 3758618, at *11 (E.D.N.Y. Dec. 19, 2006) (lost franchise fees post-termination were the result of franchisor's decision to terminate, not franchisee's breach) *and Mister Softee, Inc. v. Amanollahi*, No. 214-cv-01687 (KM), 2016 WL 5745105, at *12–13 (D.N.J. Sept. 30, 2016) (same) *with Coraud LLC v. Kidville Franchise Co., LLC*, 121 F. Supp. 3d 387, 398–99 (S.D.N.Y. 2015) (noting that this doctrine is subject to "some debate") (citing

28

cases) *and Moran Indus., Inc. v. Mr. Transmission of Chattanooga, Inc.*, 725 F.Supp.2d 712, 721 (E.D.Tenn.2010) (noting that this doctrine "has come under scrutiny from courts and commentators alike in recent years"). Yet, independent of the merits of this argument in other circumstances, at this stage of the litigation and drawing all reasonable inferences in Bloomberg's favor, Optima's alleged breaches could plausibly have been a substantial factor in Bloomberg's loss of post-May 2015 licensing fees. Therefore, Optima's motion to dismiss Bloomberg's request for lost licensing fees is denied.

## IV. Conclusion

For the reasons given above, Optima's motion to dismiss Bloomberg's first counterclaim for breach of contract is granted solely as to Bloomberg's counterclaim against Optima Sports, with the exception of any alleged breaches by Optima Sports of paragraph 10(d) of the Agreement. The Court also dismisses Bloomberg's second counterclaim in part, dismissing it as to trademark infringement under the Lanham Act, but not as to its New York common law counterclaim. Finally, the Court dismisses Bloomberg's third counterclaim for fraudulent inducement in its entirety. Bloomberg has already amended its counterclaims once in response to Optima's initial motion, which pressed the same arguments as those Optima raises here. Moreover, Bloomberg has not requested an opportunity to amend nor stated what amendments, if any, it would seek to make. For those reasons, these dismissals are with prejudice. *See Gallop*, 642 F.3d at 369. Bloomberg's previous motion to dismiss, Dkt. No. 52, is hereby dismissed as moot. This resolves docket items numbers 52 and 60.

Pursuant to the discovery schedule agreed to by the parties, all fact discovery shall be completed within 120 days after the date of this Order and all expert discovery shall be completed 180 days after the date of this Order. Dkt. No. 81. A post-discovery conference is hereby scheduled for August 16, 2019, at 3:45 p.m.

29

SO ORDERED.

Dated: March 29, 2019

New York, New York

ALISON J. NATHAN
United States District Judge