USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/14/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Optima Media Group Limited, *et al.*,

                          Plaintiffs,

            —v—

Bloomberg L.P.,

                          Defendant.

---

17-cv-01898 (AJN)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

ALISON J. NATHAN, District Judge:

Optima Media Limited and Optima Sports Management International (UK) Limited brought suit against Bloomberg L.P. for Bloomberg's termination of the parties' license agreement. Bloomberg asserted counterclaims against the Optima entities for their failure to perform under a license agreement and a guaranty agreement, and for the use of Bloomberg's trademarks post-termination. The Court held a nine-day bench trial starting on October 5, 2020, with closing argument on December 10, 2021. This Opinion constitutes the Findings of Fact and Conclusions of Law as required by Rule 52 of the Federal Rules of Civil Procedure.

In sum, the Court finds that the Optima entities have failed to prove any asserted claims. Bloomberg, however, has proved its counter-claim for breach of contract as a result of the Optima entities failure to adequately perform their obligations as set forth in the Agreement. Bloomberg has also established damages in the amount of $17,386,082 and entitlement to fees and costs.

1

# FINDINGS OF FACT[1]

## I.  BACKGROUND

### A.  The Optima Entities ("OMG")

Optima Media Group Limited is a Nigerian company that was majority owned by Rotimi Pedro, who was also the CEO of the company.[2]  PRDFOF ¶ 3.[3]  Mr. Pedro was also the part owner and director of Optima Sports Management International Limited.  *Id.*  In addition to those entities, Mr. Pedro also created various sub-entities to carry out the objectives of the parties' Agreement in this case, including Bloomberg Television Africa Limited, BTVA Limited, and Optima Media Group.  *Id.* ¶ 88.  The Court generally refers to all the Optima entities as "OMG" in this opinion but distinguishes among them when necessary.

### B.  The Agreement

On January 1, 2012, the parties executed a license agreement and guaranty agreement (together, "the Agreement"). DX-001.

#### 1.  The License Agreement

Bloomberg L.P., an international media company, entered into a "Content Sharing and Licensing Agreement" with Optima Media Group Limited.  DX-001.

---

[1] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

[2] The parties dispute whether Mr. Pedro transferred a controlling interest in OMG to his minor daughter in early 2015, which Bloomberg claims was a basis for termination of the Agreement.  As explained *infra* COL I.B.1, the Court need not address this issue because it finds other grounds for termination.

[3] This Opinion refers to the record and briefings using the following abbreviations: Plaintiffs' Response to Defendant's Findings of Fact ("PRDFOF"), Defendant's Response to Plaintiffs' Findings of Fact ("DRPFOF"), Plaintiffs' Conclusions of Law ("PCOL"), Defendants' Conclusions of Law ("DCOL"), Plaintiffs' Response to Defendant's Conclusions of Law ("PRDCOL"), Defendant's Response to Plaintiffs' Conclusions of Law ("DRPCOL"), Plaintiffs' Exhibit ("PX"), Defendant's Exhibit ("DX"), Declaration ("Dec."), and Trial Transcript ("TT").

The purpose of the License Agreement was for OMG to "produce a live weekday programming window" under the Bloomberg name that would "primarily focus on business and general news and current affairs targeted to a West African audience." Agreement ¶¶ 1(a)(i), (a)(iv). Under the License Agreement, the parties were to ensure that the "look and feel" and "the quality and integrity" of the programming window "meet the production, operational, and quality standards" established by Bloomberg Television (BTV). *Id.* ¶ 1(a)(iii). The License Agreement explicitly stated that the programming window, which was to be called Bloomberg West Africa or something similar, would be launched "on or before June 30, 2012." *Id.* ¶ 1(a)(i).

The License Agreement gave OMG the primary responsibility for creating, funding, and administering the Bloomberg West Africa channel. OMG was "responsible for[] the production and administration of" the live programming window, including "payment of all 'set-up' and maintenance costs," "management of all day-to-day operations[,]" and any "other administrative functions as are customary for the operation of a channel." *Id.* ¶ 1(a)(ii). OMG was also to create a television studio in Lagos with camera positions in Johannesburg and Nairobi that would "match the look-and-feel of the BTV London studios," or otherwise adapt existing facilities for that purpose. *Id.*

For its part, Bloomberg was to license its intellectual property for the Project and provide general guidance to OMG. *Id.* ¶ 7. Bloomberg also could employ, at its discretion, Executive Producers to provide assistance to OMG and monitor the Project. *Id.* Moreover, Bloomberg was required to allow reasonable access to its studios in New York, Hong Kong, and London upon request. *Id.* OMG, however, was to be "solely responsible" for the cost of using Bloomberg's studios and was also required to provide reasonable office space and travel accommodations for the Executive Producers. *Id.*

Under the License Agreement, OMG was to receive the right to market and sell 90% of commercial slots in the Channel Window.  *Id.* ¶ 5(c).  Bloomberg was to receive license fees from OMG for the five-year duration of the License Agreement as well as 10% of advertising slots on the channel.  *Id.* ¶¶ 4, 5(c), 8(a), 10(a).

The License Agreement also provided both parties the right to terminate prior to the expiration of the Agreement's five-year term under certain conditions.  As relevant here, either Bloomberg or OMG could terminate if either "fails to cure any material breach . . . within thirty (30) days following written notice," if either "becomes insolvent," or if either "has a change in corporate control."  *Id.* ¶ 8(b)(i).  Additionally, Bloomberg enjoyed unilateral termination rights if "the representations, warranties, or covenants made by" OMG in the Agreement "were no longer true."  *Id.* ¶ 8(b)(ii).  In a separate provision titled "REPRESENTATIONS WARRANTIES AND COVENANTS," the Agreement provides in relevant part that OMG "warrants, represents, and covenants that," as relevant here, it (1) "shall fulfill its obligations to Bloomberg in accordance with the terms set forth in this Agreement," (2) "shall promptly obtain . . . any and all rights, licenses, approvals, clearances, releases, local and international authorizations necessary to perform its obligations under this Agreement," and (3) that it "is in compliance with and shall comply with all applicable laws, rules, and regulations with respect to its rights and obligations under this Agreement."  *Id.* ¶ 12(b).

The License Agreement also provided that the parties' obligations to perform would be excused if that failure was caused by a *force majeure*, which includes "any cause beyond the control of the party whose performance is so affected, including without limitation, an act of God, fire, war, terrorism . . . any legal prohibition, decree, regulation, or requirement of any governmental authority having jurisdiction," so long as the "affected party takes commercially

4

reasonable efforts to mitigate the effects of such causes." *Id.* ¶ 14(g). The clause states that "the affected performing Party shall promptly notify the other Party of the nature and anticipated length" of the *force majeure* and that during that time both parties will be excused from performing. *Id.*

Lastly, the License Agreement provided "[n]o changes, modifications, or waivers regarding this Agreement shall be binding unless in writing and signed by the Parties hereto," and that "[n]o failure of either Party to exercise or enforce any of its rights under this Agreement shall act as a waiver of such rights." *Id*. ¶ 14(d).

## 2. The Guaranty Agreement

In conjunction with the License Agreement, Bloomberg entered into a Guaranty Agreement with Optima Sports Management International (U.K.) Limited ("OSMI"). Agreement at 34. The Guaranty Agreement provided that, in the event Optima Media Group Limited "fails to pay any amount(s) due to Bloomberg under" the License Agreement, then OSMI "guarantees, as primary obligor and not merely as surety, to Bloomberg the full payment of any and all such amount(s)." *Id.*

## 3. The Amendment

The parties signed an Amendment to the Agreement in the Fall of 2012. DRPFOF ¶ 49. The Amendment expanded the scope and size of the Agreement in a number of ways. First, the term of the Agreement was expanded from five years to eight. DX-002 ("Amendment") ¶ 6. Second, while the original Agreement had defined the territory of the Project as West Africa, the Amendment expanded the territory to "the entire African continent." *Id* ¶ 4. Third, the amount of license fee payments OMG was to make to Bloomberg was significantly increased. *Id* ¶ 7.

And fourth, Bloomberg was to receive a portion of gross revenue from the Project in addition to license fee payments and the right to 10% of advertising slots.  *Id.* ¶ 8.

Additionally, although the original Agreement had set June 30, 2012 as a deadline for OMG to launch the Bloomberg West Africa channel, OMG did not do so by that time and the Amendment executed in November of that year did not contain a new deadline for launch. DRPFOF ¶ 49-51.

### C. Termination

After three years of the parties working together on the Project, Bloomberg terminated the Agreement on May 7, 2015.  DRPFOF ¶ 213.   In its Notice of Termination, Bloomberg stated that its grounds for termination under the Agreement were that OMG had "become insolvent" under ¶ (8)(b)(i)(b), and that its "representations and warranties," were "no longer true" under ¶¶ 8(b)(ii)(b) and 12(b).  *Id.*

## II.  PROCEDURAL HISTORY

OMG filed a Complaint in this Court for breach of contract and breach of the covenant of good faith and fair dealing, citing Bloomberg's "use of a pretextual excuse to willfully and unlawfully terminate an agreement that the media giant no longer intended to honor."  Dkt. No. 1 ¶ 1.  In OMG's Amended Complaint, they argue that Bloomberg's termination was unlawful because "[OMG] was not, and had never been, insolvent" and OMG had fulfilled its obligations under the Agreement.  Dkt. No. 32 ¶¶ 58, 143.  OMG maintained that Bloomberg knew that "the Project's launch in Lagos was merely days away" and the "Project was set to cross the finish line," but it unlawfully terminated nonetheless because the Project "clashed with Bloomberg's new approach" for "brand-building . . . in emerging markets" and because it was concerned about potential "negative media attention" surrounding the partnership.  *Id.* ¶¶ 143, 152-53.

OMG also claims that Bloomberg breached the implied covenant of good faith and fair dealing when it terminated and when it forced a renegotiation of the parties' Agreement in the Fall of 2012. *Id.* ¶ 186.

Bloomberg filed a Motion to Dismiss the Amended Complaint, arguing that its termination of the Agreement was lawful and that OMG cannot bring a claim for breach of contract because it failed to substantially perform. Dkt. No. 34 at 1-3. The Court dismissed OMG's implied covenant of good faith and fair dealing claim to the extent it was based on the termination and denied OMG's request for consequential damages, but otherwise permitted the claims for breach to go forward. Dkt. No. 44 at 17.

Bloomberg then filed an Answer denying all claims and asserting counterclaims against OMG for breach of the Agreement and for trademark infringement and fraudulent inducement. Dkt. No. 49. In their motion to dismiss Bloomberg's counter-claims, OMG argued that Bloomberg waived its rights to terminate on the grounds that OMG did not meet the June 30, 2012 launch date and that the other purported grounds for termination were invalid. Dkt. No. 54. Bloomberg amended its counterclaims on June 29, 2018 and OMG filed another Motion to Dismiss. Dkt. No. 58, 60.

On April 17, 2019, the Court dismissed Bloomberg's fraudulent inducement counterclaim, its trademark infringement counterclaims except for those based in New York common law, and all of its breach of contract counterclaims against OSMI, except for the claim that it breached its duties as a Guarantor. Dkt. No. 91 at 29. The Court permitted Bloomberg's remaining counterclaims to go forward. *Id.*

The Court held a nine-day bench trial starting on October 5, 2020, with closing argument on December 10, 2021. Dkt. No. 150. The Court heard live testimony from six witnesses and

watched the deposition testimony of five others.  Following trial, the parties submitted proposed

conclusions of fact and findings of law.  Dkt. No. 168-173, 175-176.

## III.  FACTS LEADING TO TERMINATION

### A.  From 2012 to late 2014, OMG had serious performance failures and Bloomberg continued to support the Project

OMG struggled to meet its performance obligations from the outset, but Bloomberg

nonetheless continued to support the Project up until termination.  OMG struggled to make

timely quarterly license fee payments to Bloomberg in accordance with the schedule set out in ¶

10 of the Agreement, beginning with the very first invoice of $187,000 in the first quarter of

2012.  DRPFOF ¶¶ 41-42.   Bloomberg did not terminate after OMG failed to make this first

payment, and even when OMG repeatedly failed to make timely payments throughout the period

of 2012 to 2014, Bloomberg continued to accept late or partial payments up until termination.

*Id.* ¶ 189.

License fee payments were certainly not the only issue.  Under the Agreement, OMG was

responsible for constructing a studio in Lagos capable of launching live programming, but

construction on the studio was continually delayed from the outset because of payment issues.

PRDFOF ¶ 27.  As a result, the anticipated June 30, 2012 live launch date of the Bloomberg

Africa channel came and went.  *Id.* ¶ 28.  Bloomberg did not terminate at that time and continued

to permit delays in live launch for years thereafter.  DRPFOF ¶ 51.

OMG would ultimately never launch live programming out of Lagos prior to termination

because of OMG's inability to pay employees, suppliers, and vendors on the Project.  Although

Bloomberg was generally aware that OMG had payment issues, it nonetheless took affirmative

steps to support the Project up until termination, such as permitting OMG to work out of the

London studio and providing Executive Producers to assist with the Project at various points, as

it was permitted but not required to do under the Agreement. DRPFOF ¶¶ 68, 70, 74, 131; Agreement ¶ 7(a).

**B. Bloomberg clearly communicated its expectations that OMG perform its obligations under the Agreement and OMG was aware of these expectations**

As it continued to support the Project in the initial years, Bloomberg did not ever expressly communicate to OMG that it was reserving its rights to terminate or otherwise threaten OMG with termination. DRPFOF ¶ 214. However, throughout the duration of the Agreement Bloomberg communicated its expectations that OMG make timely payments and launch live programming. It also regularly expressed dissatisfaction with OMG's failure to meet these objectives.

Bloomberg's Executive Producers on the Project constantly stressed to OMG that it was vital that it make timely payments and launch live programming. Lindsey Oliver, the Executive Producer on the Project in the 2012 through 2014 time period, credibly testified that she "urged Mr. Pedro to make payments as soon as possible" and that "Bloomberg wanted Optima to launch as soon as reasonably possible." TT 85:11-13, 90:14-17. The next Executive Producer on the Project, Sophie Mongalvy, continued to discuss the payment problems with Mr. Pedro and Richard Harrison, the Managing director of Optima, in the Fall of 2014 and expressed concerns about how they were affecting the Project. *See e.g.*, DX-205; DX-201; PX-106. Adam Freeman, Bloomberg's regional managing director, credibly testified that during the early 2015 time period he had "a number of conversations with [Mr. Pedro and Mr. Harrison] about performance issues, about finance, delays in launch, non-payment of staff" and that "we were talking about these issues on an ongoing basis." PX-902 at 282.

The Court finds based on the evidence at trial that OMG was fully aware of Bloomberg's expectations and Bloomberg's disappointment with OMG's performance failures. Mr. Pedro

testified at trial that from the very early days of the Project Bloomberg "pressed [him] to get license fee payments made as soon as possible," TT 334:8-10, and executives at OMG reported contemporaneously that the salary payment issues for those working on the Project were a "massive issue to Bloomberg," DX-121. In early 2014, the CEO of Bloomberg, Justin Smith, credibly testified that he and Mr. Pedro had a face-to-face meeting in New York where he "convey[ed] Bloomberg's concerns with respect to [OMG's] failure to meet its contractual obligations." Smith Dec. ¶ 21. In March of 2015, Mr. Harrison reported internally that he had a "very frank meeting" with Mr. Freeman and that "[h]e is clearly not happy and . . . want[s] some very firm guarantees from us in place moving forwards . . .," including, *inter alia*, that all staff internationally are paid in full by March 9, the bank guarantees to Bloomberg are in place by March 13, and that overdue payment to Bloomberg is made by March 20, and a commitment to launch by April 27 "at the very latest." DX-236. These guarantees would not ever be met.

### C. OMG made regular assurances to Bloomberg that it would eventually perform its obligations and on some occasions took deliberate steps to conceal its failures from Bloomberg

As Bloomberg continued to express its dissatisfaction with OMG's failure to meet its expectations, OMG tried to keep Bloomberg assuaged.

OMG continually assured Bloomberg that it would eventually perform its obligations. After the initial launch date for live programming passed, OMG told Bloomberg regularly for a period of years that launch was only months away. *See* PRDFOF Appendix A. OMG constantly told Bloomberg that its payment problems would soon be resolved and that it would begin making payments in full and on time. When invoices became due, OMG would tell Bloomberg's finance department that "payments will be made" even as it continued to fail to make them. DX-70. Mr. Pedro told Mr. Smith in person in early 2014 that "payments were

coming" and tried to "convince [him] about[] Optima's integrity." Smith Dec. ¶¶ 21-24. And as payment failures worsened in 2015, the assurances continued. OMG told Bloomberg that it would soon be able to make timely payments once it obtained an offshore bank account, its ability to exchange foreign currency would improve, and OMG's administrative team was struggling but payments would be made if streamlined to Mr. Pedro, and so on. *See* DX-205; DX-202; PX-103.

In addition to providing regular assurances that its performance would improve, the Court finds that OMG also took deliberate steps to conceal the fact from Bloomberg that it was still struggling to perform its payment obligations. At various points in 2014, Mr. Harrison wrote internal emails explaining that OMG needed to hide its failure to pay salaries from Bloomberg and make sure it paid first certain employees or vendors that might have conversations with Bloomberg about late payment. *See, e.g.,* DX-138; DX-091; DX-083. In 2015, Mr. Harrison even told OMG personnel to be careful not to share any negative information with Ms. Mongalvy, Bloomberg's Executive Producer on the Project at the time, during team meetings so it would not get back to Bloomberg. DX-504.

By 2015, OMG's financial situation became more desperate and so did OMG's attempts to hide it. During this time, because OMG's relationship with its banks was deteriorating, OMG was attempting to secure financing from Stanbic bank. DX-185; TT 409:1-4. On April 29, 2015, Mr. Harrison told Bloomberg executives in an email that while OMG had "some cash flow issues over the last 6 months which have affected timely payments to a number of staff and suppliers," OMG had received "approval of a USD denominated facility by Stanbic Bank" that will ensure that "we have operational funding in hard currency outside Nigeria and for the foreseeable future," and that "all our financial obligations both past, present, and future are met

with speed and openness." DX-307. This statement was false at the time it was made – a week

earlier, a representative from Stanbic Bank informed OMG that the bank had denied its

application. DX-292. Mr. Pedro admitted at trial that the April 29 email, which had been sent to

him for review by Mr. Harrison prior to sending, was a false representation. TT 410:9-14.

Though Mr. Pedro claims that information regarding the Stanbic application was inadvertently

included in the email, the Court rejects that testimony. At the very least, the Court finds that Mr.

Pedro was aware that the false statement was included in the email and likely edited or

contributed to the false statement himself. TT 410-418.

### D. The Project fell apart in 2015 and Bloomberg terminated the Agreement

While OMG struggled to perform from day one, it was not until 2015 that the Project

completely fell apart.

By mid-2014, OMG was struggling to generate revenue. In the Fall of 2014, Mr. Pedro

reported internally that "[w]e are beginning to become legendary here" with how much OMG

was struggling to generate revenue due to a lack of planning and problems with operational

procedures. DX-149. Then in January 2015, a financial consultant advised OMG that "[y]our

numbers are not good and at such a crucial year you don't have a functional operating budget

and it's the end of January." DX- 193. Edson Aigbe, an executive in charge of finance at OSMI,

credibly testified with regards to the Bloomberg Africa Project that by 2015 "we weren't

generating enough revenue to pay the bills, and our fallback was always the bank, and the bank

wasn't giving any money anymore." DX-462 at 127.

OMG's financing was in fact in dire straits. According to their financial consultant,

OMG banks were planning to close in as OMG was "technically insolvent." DX-193; DX-185.

At the time, another executive noted internally that "OMG coffers are [] seemingly empty and

the bank loans apparently exhausted." DX-129. Although OMG tried to obtain additional financing in early 2015, that application was denied. DX-292.

Without revenue or financing, OMG was unable to fund the Project. Employees in London, Lagos, and South Africa were not receiving paychecks on time, in full, or at all. DX-104; DX-140. Eventually, employees started to leave. In early 2015, multiple producers and technical employees quit, one of them explaining that they couldn't "afford to come to work next week and until we get paid." DX-261; PX-100. In February 2015, the Director of Technical Operations on the Project left due to "payment issues" with his salary, DX-199, and then in March 2015, the employees in the London and Johannesburg newsrooms quit working and indicated that they would stop all production until they got paid, DX-234. By April 15, a month prior to termination, multiple employees across the various studios were refusing to work for weeks at time, DX-290; Mongalvy Dec. ¶¶ 121-125, a situation Mr. Harrison referred to as a "nightmare," DX-270. Mr. Harrison said at the time that staff "morale across all locations is at its lowest it has ever been" and that OMG was struggling to recruit new workers because "the reputation of late payment is becoming well known within the industry." DX-290.

Suppliers and vendors were not getting paid either and they began cutting off services. In February 2015, Getty Images suspended OMG's access to its database, which contained licensed photographs that the Project used, for failure to pay. DX-214. In both January and March 2015, one of the Project's suppliers of video footage, AFP, temporarily suspended services for failure to pay, which Ms. Mongalvy reported internally would have "major repercussions" as the Project "reli[ed] heavily on AFPTV's coverage." DX-178; DX-187; DX-263. During the same time period, a hotel used to house staff for the Project in Nigeria locked workers out of their rooms because OMG owed it over 4 million naira. DX-247.

Because of the serious lack of manpower and resources, production came to a grinding halt. Pre-recorded shows had to be cancelled, DX-233; DX-234, and live launch continued to be delayed, DX-293; DX-321. By late April, shows were being canceled half of the time according to Mr. Harrison. DX-303. Of the three primary weekly pre-recorded shows that OMG had been producing, one failed to air for 10 out of the 18 weeks between January 1 to May 7, 2015 and the other two failed to air for 15 weeks during that time. Pedro Dec. ¶¶ 184, 211, Schedule B. The Executive Producer on the Project reported around this time that OMG did not have enough cameras in its studio and producers were regularly late for interviews because there wasn't enough fuel in the staff bus. DX-168. During that final week prior to termination, all shows had been canceled, and the Nigeria staff "sat in darkness" because "the generator ran out of diesel and the bus that the cameramen often use is out of fuel." DX-321. In sum, the Project was in a downward spiral.

OMG attempted to paint a different picture of this time period at trial, arguing instead that the Project was right on the cusp of live launch before termination. Specifically, they point to a few instances of Bloomberg Executive Producers or other executives reporting positively on the Project internally, including statements such as that "there's definitely some progress," PX-0118, and "[w]e are all clear that we are launching an exciting new channel in Africa that is made in Africa," PX-0124. But the Court does not find these few isolated statements to be probative of meaningful progress in light of the mountains of evidence to the contrary. And while OMG claims that in the middle of March 2015 it was conducting rehearsals in the Lagos studio in preparation for the live launch, those rehearsals were not up to Bloomberg's standards for the Project. According to the Bloomberg Executive Producer on the ground, these were "small show rehearsals" that were done "mainly to test the studio equipment," PX-0128, and a

Project consultant who saw the rehearsals commented that they were "amateurish and sure to alienate every would-be viewer who is not deaf and blind," DX-309. Lastly, OMG presented evidence that in late April 2015, an internal report was circulated to Bloomberg stating that, with respect to the live launch in Lagos, that "the remaining issues are small and all technical work is due to be in place by the end of May." PX-135. Even crediting this statement that "technical work" was close to being completed by this time (which is difficult to do because this exhibit does not reveal who is responsible for this statement), the Court finds based on the evidence at trial that the Lagos studio was not capable of live broadcast on May 7, 2015 and that funding problems had halted nearly all work on the Project.

Eventually, Bloomberg terminated. By the date of termination on May 7, 2015, OMG had become – as its counsel admitted at trial – insolvent. TT 1119:11-19. OMG was unable to pay its debts as they became due in the ordinary course of business: it failed to pay months-worth of employee's salaries and payments for services rendered on both continents, was months in arrears on payments to various tax authorities (including at least 20 million in *naira* to the Nigerian government), DX-314; DX-296, and had not paid $750,000 worth of license fees to Bloomberg, PRDFOF ¶ 207. According to an estimate by Mr. Harrison on May 5, 2015, during that time OMG owed over 480 million naira in Project-related debts, or $1.25 million in U.S. dollars. DX-340; DX-320. After three years, OMG still had not launched live programming out of Lagos and was now failing to run even pre-recorded programming, and OMG did not appear to have secured any concrete plans for sustainable future financing of the entire Project. In light of this evidence, the Court finds that Bloomberg terminated the Agreement because of OMG's performance failures.

## CONCLUSIONS OF LAW

15

# I.    OMG'S BREACH OF CONTRACT CLAIM

OMG brings a claim for breach of contract against Bloomberg for its purportedly unlawful termination, which OMG argues caused $53,345,877 worth of damages from OMG's investment in the Project.  PCOL at 22.  New York substantive law governs the contract claims.[4]

Under New York law, "[i]n order to recover from a defendant for breach of contract, a plaintiff must prove . . . (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach."  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).  The burden is on OMG to prove each of these elements by a preponderance of the evidence.  *Id.*

OMG cannot recover for breach of contract because it failed to establish two of these elements: that OMG substantially performed its obligations under the Agreement and that Bloomberg breached the Agreement.

## A.  OMG did not substantially perform

In order to recover for breach of contract, a party must first show it substantially performed under that contract.  *See Diesel Props S.r.l*, 631 F.3d at 52.  "[A] party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."  *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc*., 500 F.3d 171, 186 (2d Cir. 2007).  Whether OMG substantially performed under the Agreement is "a question of fact," for the Court to determine as fact-finder based on the evidence presented at trial.  *Id.*  To decide whether OMG substantially

---

[4] Aside from Bloomberg's counterclaim for trademark infringement, the parties' briefs assume that New York law governs per the choice-of-law clause in the parties' Agreement. This implied consent is sufficient to establish the applicability of New York substantive law.  *Arch Ins. Co. v. Precision Stone, Inc*., 584 F.3d 33, 39 (2d Cir. 2009).

performed under New York law, the Court must decide whether OMG's failures "go[] to the root of the agreement" with Bloomberg and are "so substantial that it defeats the object of the parties in making the contract." *VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379-80 (S.D.N.Y. 2014). The Court looks to factors such as "the magnitude of default, its effect on the contract's purpose, the willfulness of the breach, and the degree to which the injured party has benefitted under the contract." *Id.* at 380.

The Court finds that as of May 7, 2015 OMG had failed to substantially perform under the Agreement. The evidence at trial shows that the "magnitude of [OMG's] default" was so severe that it had a fatal effect on the "contract's purpose." *VFS Fin., Inc.*, 17 F. Supp. 3d at 379-80. The purpose of the parties' Agreement was the "Creation of [the] Bloomberg Africa programming window," a live news and business channel under the Bloomberg name and of Bloomberg "quality." Agreement ¶ 1(a). That never happened, because OMG was unable to meet its core responsibilities under the Agreement to pay all set up and maintenance costs, create a studio in Lagos capable of broadcasting live television, and launch and administer the channel. *Id.* ¶ 1(a)(i), (ii). In addition to its inability to sustain the Project, OMG struggled to make timely license fee payments throughout the duration of the Agreement. These were not just small or temporary setbacks, they constituted a total failure "to perform its side of the bargain." *Merrill Lynch & Co. Inc.*, 500 F.3d at 186.

OMG has a different view of what constitutes "substantial." It argues that the June 30, 2012 launch date was not a hard and fast deadline, and by Spring 2015 OMG was getting close to launching live programming and at least was able to generate some pre-recorded content in the interim. The Court finds that these efforts did not constitute substantial performance. Bloomberg did not contract for pre-recorded shows – it contracted for OMG "to create original

17

live programming." Agreement at 1. And even if the June 30, 2012 deadline was not material to the bargain, the Court need not decide whether the failure to meet the June 30, 2012 deadline was a failure to substantially perform. It is sufficient to determine that OMG's failure to launch three years after the contractually agreed upon date was not substantial performance, especially considering that the Project was far from approaching live launch in Spring 2015.

Lastly, OMG argues that Bloomberg waived its right to demand substantial performance on these terms. As explained *infra* COL I.B.3, the Court concludes that Bloomberg did not waive any of these rights under the Agreement. Therefore, OMG cannot establish its breach of contract claim because OMG failed to substantially perform its own contractual obligations.

### B. Bloomberg did not breach the Agreement

OMG's claims for breach of contract fail for the separate reason that Bloomberg did not breach the Agreement. The basis for OMG's claim for breach is that Bloomberg's decision to terminate on May 7, 2015 was a breach of the Agreement. To the contrary, Bloomberg properly terminated in accordance with the terms of the Agreement. By May 7, 2015, a number of the grounds for termination had been satisfied, including that OMG was insolvent and that various representations and warranties OMG made were no longer true. Moreover, despite OMG's arguments to the contrary, the performance failures giving rise to the right to terminate were not excused by *force majeure* and Bloomberg did not waive its right to terminate on those grounds or elect a remedy other than termination.

### 1. As of May 7, 2015, a number of the stated conditions for termination in the Agreement were satisfied

The parties' Agreement provided that Bloomberg would be able to terminate prior to the natural expiration of the Agreement under certain conditions, including if OMG "becomes insolvent." Agreement ¶ 8(b)(i)(b). When Bloomberg provided OMG notice of termination on

May 7, 2015, it claimed that several of those stated conditions had been met, including OMG's insolvency.

As a preliminary matter, OMG claims that Bloomberg's stated reasons for terminating were pretextual and that Bloomberg actually terminated out of concern for potential "reputational damage" that might result from a purported media inquiry in April 2015 by a journalist who was "threatening to make public certain late-payment issues." PCOL at 2-3. According to OMG, this was an improper reason for termination. But this argument fails to appreciate the distinction between Bloomberg's motivation for terminating and its basis for terminating. Under New York law, the former is irrelevant, as Bloomberg "has an absolute, unqualified right to terminate" in accordance with the Agreement's termination clause "without court inquiry into whether the termination was activated by an ulterior motive." *Big Apple Car, Inc. v. City of New York*, 611 N.Y.S.2d 533, 534 (N.Y. App. Div. 1994). Moreover, even if motivation were legally relevant, OMG failed to establish that Bloomberg's concern about the impact of OMG's breaches, whether that impact be reputational damage, financial loss, opportunity cost, etc., was an improper motivation for terminating the Agreement. Nor did OMG establish that this concern caused the termination decision.

Setting motivation aside, to resolve OMG's claim for breach of contract the Court must determine whether any of the stated conditions in the Agreement giving rise to Bloomberg's termination were met on May 7, 2015. The Court finds several independent bases for termination existed at that time.

To start, the Agreement permitted Bloomberg to terminate if OMG "becomes insolvent." Agreement ¶ 8(b)(i)(b). "[T]he time-honored meaning of insolvency, in the absence of a statute specifying another meaning, is inability to meet obligations as they mature in ordinary course of

business." *Meighan v. Finn*, 146 F.2d 594, 595 (2d Cir. 1944), *aff'd*, 325 U.S. 300 (1945).  At

trial, OMG admitted that it was insolvent on May 7, 2015.  TT 1119:11-19.  Even if it had not

made this admission, the Court would conclude that OMG was insolvent based on the evidence

at trial, which demonstrated that by May 2015, OMG was unable to pay the payments to

employees, vendors, or Bloomberg that arose in the ordinary course of this contract.  Thus, based

on OMG's solvency alone, Bloomberg's right to terminate had vested on May 7, 2015.

Moreover, the Agreement permitted Bloomberg to terminate if OMG's "representations,

warranties or covenants" in the Agreement were "no longer true." Agreement ¶ 8(b)(ii)(b).  The

Court finds that, on May 7, 2015, multiple of OMG's representations were no longer true.

First, although OMG represented that it would "comply with all applicable laws, rules,

and regulations with respect to its rights and obligations" under the paragraph 12(b) of the

Agreement, as of May 7, 2015 it had failed to comply with tax laws in multiple jurisdictions and

owed significant amounts in Project-related taxes, including over 20 million in *naira* to the

Nigerian government.  OMG argues that this clause in paragraph 12(b) of the Agreement did not

contemplate that "amounts owed to—and being negotiated with—taxation authorities" would be

a basis for termination, PRDCOL at 7, but the Court rejects that interpretation as incompatible

with the plain meaning of that clause.  Tax laws are "applicable laws. . . with respect to" OMG's

"obligations" under the Agreement because compliance with those laws is necessary for the

survival of the Project. A failure to pay Project-related taxes will inevitably result in serious

negative consequences for the Project, including having to pay penalties and assessments, and

indeed two Project-related entities were in fact wound up after termination.  DX-356; DX-358.

And because tax laws are "applicable laws" under paragraph 12(b), OMG's failure to pay these

taxes not only threatened the viability of the Project, but it rendered OMG's representation untrue and thus constituted a basis for termination.

Second, while OMG represented that it would obtain "all rights, licenses, approvals, clearances, releases, local and international authorizations necessary to perform its obligations" under paragraph 12(b) of the Agreement, as of May 7, 2015 OMG had major struggles exchanging foreign currency. Undoubtedly, obtaining approval to exchange foreign currency was "necessary" for OMG to perform its obligations under the Agreement, considering that OMG was required under the Agreement to pay license fees to Bloomberg in U.S. dollars, Agreement ¶ 10(a), and by its own account OMG's inability to obtain foreign currency prevented it from making Project-related payments. OMG nonetheless argues that exchanging *naira* for foreign currency was not one of the obligations contemplated in 12(b). According to OMG, in Nigeria, exchanging foreign currency is far from guaranteed and "there is no evidence" that any such "right, license, or approval for [foreign currency exchange] can be 'obtained and maintained." PRDCOL at 9. Instead, OMG argues the exchange is a complicated process of "bids or applications on an as-needed basis." *Id.* The Court disagrees. The fact that a "bid" or "application" must be made at all demonstrates that some form of approval, right or license is required in order to exchange *naira* in Nigeria. And just because the application process for exchanging *naira* is "not guaranteed," DRPFOF ¶ 149, does not mean that the parties did not contemplate that this kind of obligation would be covered by 12(b). To the contrary, in this provision OMG expressly agreed to take on the responsibility of obtaining all the approvals, rights, licenses, etc. from third parties that were *necessary* to launch the Project, regardless of whether they were "guaranteed." Therefore, OMG's failure to obtain the necessary approvals to exchange foreign currency for the Project was grounds for termination.

Third and finally, OMG's representation that it would "fulfill its obligations as set forth in the terms of the Agreement" under paragraph 12(b) was also no longer true as of May 7, 2015. As explained *supra* COL I.A, OMG failed to substantially perform its obligations under the Agreement, including its obligations to pay all set up and maintenance costs for the Project, build or adapt a studio in Lagos capable of live programming, and launch the Bloomberg West Africa channel. OMG argues that the representation in paragraph 12(b) that it would "fulfill its obligations" under the Agreement only becomes untrue if there is a "material change in the status of the Project." PCOL at 14. The Court rejects this interpretation of 12(b). But even accepting it does not change the outcome. As of May 7, 2015, OMG was insolvent, there was still no live programming three years after the initial projected launch date, and work on the Project was nearly halted due to payment issues. Thus, there was in fact a material change in the status of the Project for the worse in 2015. OMG was not fulfilling its obligations even in the most general sense.

Because the Court finds each of the grounds listed above independently provided Bloomberg with a right to terminate, it need not decide Bloomberg's remaining bases for termination, including whether OMG had a "change in corporate control." DCOL at 2.

### 2. The performance failures that gave rise to Bloomberg's right to terminate were not excused by any *force majeure*.

OMG argues that even if the various termination conditions described in the previous section had technically been met, OMG's performance failures were excused under the *force majeure* clause in ¶ 14(g) the Agreement and therefore could not constitute a basis for termination. The purported *force majeure*, according to OMG, was Nigeria imposing foreign exchange restrictions in the summer of 2014. DRPFOF ¶ 148-57. However, as explained below,

OMG cannot rely on the *force majeure* provision in the Agreement to excuse its failure to perform.

First, the 2014 foreign currency exchange restrictions were not a *force majeure.* The "basic purpose of force majeure clauses" is to "relieve a party from its contractual duties when its performance has been prevented by a force *beyond its control* or when the purpose of the contract has been frustrated." *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum Ltd*., 782 F.2d 314, 319 (2d Cir. 1985) (emphasis added). "Mere impracticality or unanticipated difficulty is not enough to excuse performance." *Phibro Energy, Inc. v. Empresa De Polimeros De Sines Sarl*, 720 F. Supp. 312, 318 (S.D.N.Y. 1989). OMG's own expert Dr. Chudozie Okongwu, who is a specialist in "financial economics and valuation" and provided a detailed account of "Nigeria's economy and exchange rate regime" for the Court, Okongwu Dec ¶¶ 1, 49-78, testified that after the restrictions were imposed in the summer of 2014 it was "increasingly difficult to obtain" foreign exchange but did not "contend that it was impossible." TT 681:21-25. Therefore, although the foreign currency exchange restrictions were a burden on OMG, they did not constitute a *force majeure* because it was not impossible for OMG to exchange currency.

Second, even if the 2014 exchange restrictions were a *force majeure*, OMG would still have to show that those restrictions were the "cause" of OMG's "failure to perform" under the Agreement. Agreement ¶ 14(g). To the contrary, the Court finds that OMG's payment problems were caused not by an inability to exchange foreign currency, but an inability to generate revenue and obtain stable financing from its banks. Indeed, OMG struggled to make payments to employees, vendors, and tax authorities in *naira* just as it did in dollars or *rand.* And while there are a few instances in the record where executives at OMG *told* Bloomberg that the inability to exchange *naira* was causing its payment problems, *see, e.g.,* PX-116, the only

evidence OMG provided to corroborate the truth of these statements was the testimony of Mr. Pedro and OMG's expert. *See* Pedro Dec ¶ 199-203, Okongwu Dec ¶ 64. The Court did not find Mr. Pedro's testimony on this point to be reliable. And while the expert was generally credible, his testimony on this specific point was not persuasive because the only evidence he relied on for his conclusion that the inability to exchange *naira* was the cause of OMG's payment problems was a single email from OMG to Bloomberg. TT 681:3-6.

Finally, OMG's performance cannot be excused under the *force majeure* provision of the Agreement because OMG did not provide the required notice to Bloomberg. The parties expressly contemplated in their Agreement that they would give the other notice if a *force majeure* were to prevent their performance. The Agreement states that "[i]n the event of any such" *force majeure* "the affected performing Party shall promptly notify the other Party of the nature and anticipated length of continuance of such *force majeure* and, during such period, both Bloomberg and [OMG] shall be excused from performance." Agreement ¶ 14(g). It is undisputed that OMG never told Bloomberg that it was invoking the *force majeure* clause in the Agreement, let alone that it did so in accordance with the required methods for providing notice under ¶ 14(e) of the Agreement. Therefore, because OMG failed to comply with the requirements of the *force majeure* clause, it cannot rely on it as a defense.

OMG argues to the contrary that, even though it never expressly told Bloomberg it believed the foreign currency exchange restrictions constituted a *force majeure*, it nonetheless provided sufficient notice in an email from December 2014. In that email, Mr. Harrison told Mr. Freeman that "due to the oil crisis and the central bank of Nigeria's exchange controls we have been unable to purchase the needed currency" to make a license fee payment, but that "as already

discussed plans are in advance stages to off-shore our banking operation to ensure the Nigerian banking and forex issues are no longer a problem."  PX-146.

In arguing that this email constitutes sufficient notice, OMG relies on *Toyomenka Pac. Petroleum Inc. v. Hess Oil Virgin Islands*, 771 F. Supp. 63 (S.D.N.Y. 1991).  It is a well-established principle of New York law that courts should not construe a contractual duty as a condition precedent "absent clear language showing that the parties intended to make it a condition."  *Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co.*, 594 N.E.2d 571, 573 (N.Y. 1992).  In *Toyomenka*, the court applied this principle and determined that if a *force majeure* clause does not "expressly make a force majeure defense conditional upon giving notice," then the "notice requirement" must be "construed as a duty to be performed under the contract rather than as a condition precedent to a force majeure defense, and "only a material breach of" the duty to give notice "can affect the right to invoke force majeure."  *Id.* at 67-68 (citing *Facilities Dev. Corp. v. Nautilus Constr. Corp.*, 550 N.Y.S.2d 127, 128 (N.Y. App. Div. 1989)).  The court then held that even though the defendant's notice was late per the terms of the parties' contract, the defendant's breach was not "material" because the defendant nonetheless made a "reasonable effort to notify" the other party and "no harm or prejudice" resulted to the plaintiff from the late notice. *Id.* at 68-69.

OMG contends that its purported invocation of a *force majeure* is analogous.  It argues that under New York law, it only had a duty to provide notice to Bloomberg because the language of the Agreement did not expressly make notice a condition precedent to invoking a *force majeure*.  And OMG further argues it did not materially breach that duty because, even if it did not perfectly comply with the precise requirements of the Agreement, OMG sufficiently put Bloomberg on notice when it informed Bloomberg in the December 2014 email that it was

struggling to make payments as a result of exchange issues. Thus, OMG argues it should not be precluded from invoking the *force majeure*.

OMG's reliance on *Toyomenka* falls short. Assuming *arguendo* that OMG only had a "duty" to provide notice that it was invoking a force majeure, OMG materially breached that duty. Bloomberg cannot be reasonably expected to have known from the December 2014 email that OMG was invoking the *force majeure* clause. At most, OMG indicated that it was having difficulty making one particular license fee payment, not that it was impossible for OMG to make other Project-related payments in the future—to the contrary, OMG claimed that it was going to "ensure the Nigeria banking and forex issues are no longer a problem." PX-146. Had OMG adequately alerted Bloomberg that it considered the currency exchange restrictions a *force majeure*, then Bloomberg would have known that it was also "excused from performance." Agreement ¶ 14(g). But instead, Bloomberg continued to perform under the Agreement up until the date of termination, unaware that OMG purportedly considered its own obligations suspended. OMG's failure to make reasonable efforts to provide notice therefore caused Bloomberg substantial prejudice and OMG is precluded from relying on the *force majeure* clause in the Agreement.

### 3. Bloomberg did not waive its right to terminate the Agreement on the basis of OMG's insolvency and failure to fulfill its contractual obligations

OMG argues that, even if though it was insolvent and failed to perform certain obligations, Bloomberg was aware of those issues well before May 5, 2015 and declined to terminate or explicitly reserve its right to do so. Thus, according to OMG, Bloomberg waived its right to terminate the Agreement on these grounds. The Court concludes that OMG is judicially estopped from making this argument as to insolvency. In any event, Bloomberg never waived its right to terminate on any of the stated grounds for termination.

First, OMG is barred by the doctrine of judicial estoppel from arguing that Bloomberg waived its right to terminate on the basis of insolvency. The doctrine prevents a party who initially "assumes a certain position in a legal proceeding, and succeeds in maintaining that position," from later "assum[ing] a contrary position" because its interests have changed, especially where it "prejudice[s] [] the party who has acquiesced in the position formerly taken by him." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). The statement must also have been "adopted in some way by the court in the earlier proceeding." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 695-96 (2d Cir. 2011). OMG unequivocally stated in its complaint that OMG "was not, and had never been, insolvent." Amended Complaint ¶ 143. The Court relied on this position when it denied Bloomberg's motion to dismiss on the ground of insolvency. *See* Dkt. No. 44 at 9-10 ("Plaintiffs insist that [OMG] did not in fact become insolvent . . . Because the court cannot determine at this stage whether [OMG] was insolvent at the time of termination, Bloomberg's motion to dismiss the breach of contract claim on this ground is denied."). And as a result of OMG taking this position, Bloomberg was unable to prepare over the course of this litigation for OMG's eleventh-hour argument that OMG was insolvent well before May 7, 2015 and that Bloomberg waived its right to terminate on those grounds. OMG is therefore estopped from making this argument.

OMG attempts to avoid the application of judicial estoppel by arguing that, even though OMG claimed it was not insolvent in the Amended Complaint, OMG still made a waiver argument in the alternative. It is true that "[j]udicial estoppel applies to inconsistent factual positions, not alternative legal theories of the case," *In re Sears Holdings Corp.*, 616 B.R. 615, 627 (S.D.N.Y. 2020), and therefore if OMG had claimed that it was insolvent

"in an alternative or hypothetical manner," that claim would not be barred by judicial estoppel, *Barr v. Dramatists Guild, Inc.*, 573 F. Supp. 555, 560 (S.D.N.Y. 1983). But OMG did not frame its claim of waiver in an alternative or hypothetical manner in its complaint. OMG never mentioned a hypothetical possibility that it was insolvent and did not argue in the alternative that Bloomberg waived its rights to terminate on those grounds. Passing references that Bloomberg "well aware" of exchange and payment issues, or that Bloomberg "accepted [OMG's] performance" are insufficient, especially when those statements are not in reference to OMG's clear factual representation that it was never insolvent. Amended Complaint ¶¶ 129, 149. Thus, because OMG did not argue prior to trial that it was insolvent, in the alternative or otherwise, it is judicially estopped from making a waiver argument based on that insolvency now.

Even if OMG were not estopped from making this argument, it would still fail on the merits because at no point did Bloomberg waive its right to terminate on the basis of insolvency or any other grounds. Under New York law, waiver is "the voluntary and intentional relinquishment of a contract right." *Stassa v. Stassa*, 999 N.Y.S.2d 116, 119 (N.Y. App. Div. 2014) (quoting *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006)). A finding of waiver must be based on "a clear manifestation of intent to relinquish a contractual protection." *Id.* While intent "may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage," *Fundamental Portfolio Advisors, Inc.*, 850 N.E.2d at 658, "[s]uch intention must be unmistakably manifested," and "is not to be inferred from a doubtful or equivocal act," *Structured Capital Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 824 (S.D.N.Y. 2016) (quoting *Echostar Satellite L.L.C. v. ESPN, Inc*., 914 N.Y.S.2d 35, 39 (N.Y. App. Div. 2010)).

Based on the evidence at trial, the Court finds that Bloomberg did not manifest the intent to relinquish its right to terminate the Agreement on the basis of OMG's insolvency or performance failures. The Agreement contained an unambiguous no-waiver clause, which stated that "[n]o changes, modifications, or waivers regarding this Agreement shall be binding unless in writing and signed by the parties hereto" and "[n]o failures of either party to exercise or enforce any of its rights under this Agreement shall act as a waiver of such rights." Agreement ¶ 14(d). New York courts "uniformly enforce" these types of clauses. *Awards.com, LLC v. Kinko's, Inc.*, 834 N.Y.S.2d 147, 155 (N.Y. App. Div. 2007), *aff'd*, 925 N.E.2d 926 (N.Y. 2010). It is true that "the existence of such a clause does not preclude a waiver of contractual rights" under New York law. *Williams v. Buffalo Pub. Sch.*, 758 F. App'x 59, 63 (2d Cir. 2018) (citing *TSS-Seedman's, Inc. v. Elota Realty Co.*, 531 N.E.2d 646, 647-48 (N.Y. 1988)). But because "the words of a contract . . . are always the most important evidence of the parties' intention," *Network Pub. Corp. v. Shapiro,* 895 F.2d 97, 99 (2d Cir. 1990) (cleaned up), a no-waiver clause is highly probative of an intent not to waive.

There is no signed writing by the parties regarding any changes, modification, or waivers of the Agreement. Therefore, in light of the no-waiver clause, in order to prove that Bloomberg manifested an intent to waive, OMG would have to provide evidence sufficient to demonstrate that Bloomberg "intended for the 'no-waiver' clause to have no effect." *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie,* 784 F.3d 78, 95 (2d Cir. 2015). OMG has not met this high burden. OMG's only evidence in support of a finding of waiver is Bloomberg's decision not to terminate or reserve its rights earlier than when it did. But because the no-waiver clause unequivocally stated that "[n]o failures of either party to exercise or enforce any of its rights under this Agreement shall act as a waiver of such rights," Agreement ¶ 14(d),

the Court cannot infer Bloomberg's intention to waive solely from its inaction. *See Fin. Techs. Int'l, Inc. v. Smith*, 247 F. Supp. 2d 397, 407 (S.D.N.Y. 2002); *DeCapua v. Dine-A-Mate, Inc.*, 744 N.Y.S.2d 417, 420 (N.Y. App. Div. 2002). Aside from Bloomberg's decision not to terminate prior to May 7, 2015 – a decision the parties expressly agreed would not constitute waiver – there is no evidence in the record that Bloomberg intended for the no-waiver clause to have no effect.

To the contrary, OMG's theory that Bloomberg did not terminate prior to May 7, 2015 because it no longer expected strict compliance with the Agreement is refuted by the trial evidence. Bloomberg continually communicated its expectations that OMG comply with its obligations under the Agreement and its dissatisfaction with OMG's failures to do so. And the fact that OMG was actively trying to conceal its performance failures from Bloomberg indicates that OMG was well aware that Bloomberg still expected it to make timely payments and promptly launch live programming. Instead, the Court finds that Bloomberg did not terminate prior to May 7, 2015 because it hoped that OMG would eventually meet expectations – hopes that OMG fueled with regular assurances. It was not until it became clear in the Spring of 2015 that the Project was quickly deteriorating and that OMG was not going to be able to perform its obligations that Bloomberg exercised its right to terminate.

In situations such as these, courts have consistently held that a party's patience with a contractual partner who is struggling to perform does not equate to a waiver of the right to demand that performance under New York law. *See S.D. Hicks & Son Co. v. J.T. Baker Chemical Co.*, 307 F.2d 750, 752 (2d Cir. 1962); *Seven-Up Bottling Co. (Bangkok) v. PepsiCo, Inc.,* 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988). To hold otherwise here would punish Bloomberg for being flexible and to deprive Bloomberg of its "right to enforce" the

"unambiguous 'no waiver' clause" that it bargained for, which stated clearly that it did not have to exercise its rights to preserve them. *Bethpage Theatre Co. v. Shekel*, 518 N.Y.S.2d 408, 409 (N.Y. App. Div. 1987) (citing *Jefpaul Garage Corp. v. Presbyterian Hosp. in City of New York*, 462 N.E.2d 1176, 1177-78 (N.Y. 1984)).

Lastly, it is true that even if Bloomberg did not want to terminate right away, Bloomberg still could have informed OMG that it was considering termination, as it had sometimes done in the past with struggling contractual partners, according to its CEO, Mr. Smith. TT 896:7-23. But the issue is whether Bloomberg's failure to threaten termination demonstrates an intent to relinquish its contractual rights, not whether it was a prudent business decision. Considering the no-waiver clause and the evidence at trial, the Court readily finds that Bloomberg did not intend to waive its right to terminate.

### 4. Bloomberg did not elect a remedy other than termination

In addition to waiver, OMG argues that Bloomberg's termination was unlawful under the election of remedies doctrine, an equitable rule applied sparingly by New York courts. *See Prudential Oil Corp. v. Phillips Petroleum Co*., 418 F. Supp. 254, 257 (S.D.N.Y. 1975). The doctrine prevents a party from electing the "remedy" of continued performance after a breach and then later seeking to terminate based on that breach. *VFS Fin., Inc.,* 17 F. Supp. 3d at 383. However, although a party may "lose[] its right to terminate the contract" if it does not act in the face of a breach, "it retains the option of terminating the contract for subsequent breaches." *Awards.com, LLC*, 834 N.Y.S.2d at 156. Because Bloomberg never waived its right to terminate, each subsequent failure by OMG to make timely payments, launch live, and remain solvent was a breach of the parties' Agreement for which Bloomberg retained the right to

terminate the Agreement.  The election of remedies doctrine therefore does not apply to Bloomberg's termination of the Agreement.

* * *

In sum, OMG has failed to prove a claim for breach of contract under New York law for two independent reasons.  First, OMG's performance failures constituted a failure to substantially perform under the Agreement.  Second, Bloomberg's termination was not a breach of the Agreement because, as of May 7, 2015, multiple conditions for termination had been met, they were not excused by any *force majeure*, and Bloomberg did not waive its right to terminate on those grounds.

## II. OMG'S CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

In addition to its claim that Bloomberg's termination of the Agreement was a breach of contract, OMG also claims that Bloomberg breached the implied covenant of good faith and fair dealing when it purportedly demanded a renegotiation of the Agreement beginning in or around June 2014.  According to OMG, these unilateral renegotiation efforts "injected" substantial "uncertainty" into the Project, which hurt OMG's ability to advertise under the Bloomberg name and prepare for live launch, and that Bloomberg therefore "negatively impacted its ability to make a return off its investment."  PCOL ¶ 24-25.

"Under New York law, every contract contains an implied promise that 'neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *VFS Fin., Inc.*, 17 F. Supp. 3d at 380 (quoting *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)).  Breach of this covenant will only be found in the "narrow range of cases."  *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc*., 769 F.3d 807, 817 (2d Cir. 2014).  For example, breach of the covenant may be found where a party "acted in

bad faith[] or intended to do harm" to its contractual partner or acted "arbitrarily or irrationally in exercising the discretion afforded to it under the contract." *Lykins v. IMPCO Techs., Inc.*, No. 15 CIV. 2102 (PGG), 2018 WL 3231542, at *8 (S.D.N.Y. Mar. 6, 2018) (cleaned up). Because the "breach of the implied duty of good faith and fair dealing is merely a breach of the underlying contract," the claimant must establish the prima facie elements for a breach of contract claim, including causation and damages. *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

Bloomberg did not breach the implied covenant as Bloomberg did not act in bad faith towards OMG. First, Bloomberg did not unilaterally force renegotiation on OMG. To the contrary, OMG was the first to initiate the conversation about renegotiation, or at least communicated to Bloomberg that it was open to reconsidering the contract's terms. *See* PRDFOF ¶ 185; PX-188; DX-72. Nor is it *per se* bad faith that during these conversations, Bloomberg sought renegotiation of the contract for more favorable terms, especially considering OMG's struggles to meet its obligations. The implied covenant does not prevent a party from "act[ing] on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp*, 904 F.2d at 136. And finally, OMG has not established that Bloomberg "directly and proximately caused" any damage to OMG through the renegotiation. *Nat'l Mkt. Share, Inc*., 392 F.3d at 527. Even if the renegotiations generated some uncertainty for OMG, Bloomberg never told OMG it could not use its trademarks, took any actions to prevent or delay live launch, or otherwise did anything tangible to prevent OMG from "reciev[ing] the fruits of the contract." *VFS Fin., Inc.*, 17 F. Supp. at 380. Therefore, the Court finds based on the evidence at trial that OMG has failed to prove a breach of the implied covenant of good faith and fair dealing.

## III.    BLOOMBERG'S BREACH OF CONTRACT COUNTER-CLAIMS

Bloomberg brings counterclaims against OMG for breach of the Agreement and against OSMI for breach of the Guaranty agreement. Under New York law for both breach of contract counter-claims, Bloomberg must establish by a preponderance of the evidence that these were valid contracts, that it substantially performed under those contracts, that OMG and OSMI breached the contracts, and that those breaches caused Bloomberg damages. *See Diesel Props S.r.l.*, 631 F.3d at 52. Bloomberg meets its burden on both claims.

### A.  Breach of the Agreement

For its breach of contract claim against OMG, Bloomberg has met its burden of proof with respect to each element. Bloomberg adequately performed under the Agreement, as the evidence at trial showed that Bloomberg met its obligations to provide its intellectual property and guidance for the Project up to the date of termination. And, as discussed *supra* COL I.B., Bloomberg's termination was not a breach of the Agreement.

Moreover, as discussed above, the evidence at trial demonstrates that OMG breached the Agreement by failing to "produce a live weekday programming window," Agreement ¶ 1(a)(i), "be responsible for the payment of all 'set up and maintenance costs related thereto," *id.* ¶ 1(a)(ii)(a), "be responsible for . . . all production and administration of the Channel Window" and "management of all day-to-day operations," *id.* ¶ 1(a)(ii)(b), "be responsible for . . . [c]reation of adaptation of television studios in Lagos and camera positions in Johannesburg and Nairobi," *id.*, "be responsible for . . . obtaining and maintaining all necessary licenses, approvals, and consents," *id.* ¶ 1(a)(ii)(xi), "pay to Bloomberg" quarterly license fees, *id.* ¶ 10(a), and be "solely responsible for the payment of any and all charges levied by Bloomberg in connection"

with the use of its London Studios, *id.* ¶ 7(c). And finally, as discussed *infra* COL V, OMG's

breaches caused Bloomberg damages.

### B. Breach of the Guaranty Agreement

Bloomberg also succeeds on its claim against OSMI for breach of the Guaranty

Agreement. "[A] guaranty, as with any enforceable contract, must clearly state the obligation to

which the executor is bound." *Foresco Co. v. Oh*, 210 F. Supp. 3d 604, 610 (S.D.N.Y. 2016),

*vacated and remanded on other grounds*, *Foresco Co. v. Oh*, 696 F. App'x 550 (2d Cir. 2017).

The Guaranty Agreement states that OSMI "guarantees . . . to Bloomberg the full payment of

any and all" amounts OMG owes to Bloomberg within thirty days of the amounts falling due,

Agreement at 34, and there is no dispute that OSMI has not paid these amounts.

OMG nonetheless argues that Bloomberg cannot prove a claim for breach because it

never requested any payment from OSMI and that it therefore waived its right to do so, and that

OSMI's guaranty obligations were not triggered prior to May 7, 2015 because the unpaid license

fees had not become due at that time.

These arguments fail as to both fact and law. First, Bloomberg was not required under

the Guaranty Agreement to request payment in order to trigger OSMI's obligations to pay

OMG's debts to Bloomberg, as there is no notice obligation in the Guaranty agreement. Even if

there were a notice obligation. "[u]nder New York law, a creditor's failure to satisfy a guaranty's

notice requirement does not discharge the guarantor's obligation unless the requirement is a

condition precedent to that obligation." *Israel v. Chabra,* 537 F.3d 86, 93 (2d Cir. 2008).

Second, Bloomberg did not waive its rights under the Guaranty Agreement for the same reasons

it did not waive its rights under the License Agreement: both documents had the same "no-

waiver clauses" and Bloomberg never evidenced any intent to waive its right to receive payment

from either OMG or OSMI.  *See supra* COL I.B.3.  And third, even if OSMI's obligation to pay Bloomberg for payments owed by OMG was not triggered until after May 7, 2015, that guaranty survives termination.  "[R]ights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement." *Donohue v. Cuomo*, 980 F.3d 53, 68 (2d Cir. 2020) (quotations and brackets omitted) (citing *Kolbe v. Tibbetts*, 3 N.E.3d 1151, 1156 (N.Y. 2013)). Under the Guaranty Agreement, OSMI guaranteed to Bloomberg "all such amount(s) to which Bloomberg is entitled under the terms of the Agreement," Agreement at 34, and the Agreement stated specifically that all payment requirements "shall survive any termination or expiration of this Agreement," Agreement ¶ 14(h).  Therefore, the guaranty survives termination.

For all these reasons, OSMI is liable for the damages to Bloomberg caused by breach of the Guaranty Agreement, which includes any amounts owed to Bloomberg by OMG under the Agreement.  As explained *infra* COL V.A-B, this includes outstanding license payments prior to termination and the cost of OMG's use of the London Studios and offices.

## IV.    BLOOMBERG'S TRADEMARK INFRINGEMENT COUNTERCLAIM

In addition to its contract counterclaims, Bloomberg brings a counterclaim for trademark infringement under New York common law for OMG's post-termination use of its marks.

During the pleading stages of this case, OMG moved to dismiss this claim on the grounds that it was barred by the "established presumption . . . against the extraterritorial operation of New York law," *Glob. Reinsurance Corp. U.S. Branch v. Equitas Ltd.*, 969 N.E.2d 187, 195 (N.Y. 2012), and Bloomberg argued in response that the presumption is overcome because OMG consented to the application of New York law as a result of the choice of law clause in the Agreement, Dkt. No. 91 at 18-19.   The Court determined dismissal was inappropriate because

the choice-of-law clause is ambiguous as to whether New York law would apply to non-contract claims. *Id.*

The Court now resolves that question in favor of OMG. As New York courts are "reluctan[t]" to "construe contractual choice of law clauses broadly," *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 335 (2d Cir. 2005), "[a] choice-of law provision indicating only that an agreement will be governed by New York law will not bind the parties for non-contractual causes of action," *Warman v. Am. Nat'l Standards Inst.*, No. 15-CV-5486 (RA), 2016 WL 3676681, at *3 (S.D.N.Y. July 6, 2016) (citing *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996)). Here, the parties' choice of law clause states that "[t]his Agreement and the legal relations among the parties hereto shall be governed by and construed in accordance with the laws of the State of New York." Agreement ¶ 14(c). While the phrase "legal relations thereto" is ambiguous as to whether it refers to non-contractual legal obligations, the Court abides by its duty to construe this language narrowly and determines that it refers only to the parties' contractual relationship. Moreover, Bloomberg presented no other evidence at trial that OMG intended otherwise. Therefore, Bloomberg cannot establish a claim for trademark infringement under New York common law.

## V.    DAMAGES OWED TO BLOOMBERG

As part of its prima facie breach of contract claim, a plaintiff must prove "damages resulting from the breach." *Nat'l Mkt. Share, Inc.*, 392 F.3d at 525. In doing so, "a plaintiff must prove that a defendant's breach" both "directly and proximately caused his or her damages." *Id.* at 527. "In the law of contracts, as in torts, 'causation in fact is established if the defendant's breach of duty was a substantial factor in producing the damage.'" *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*, 156 F. App'x 349, 351 (2d Cir. 2005); *Fed. Hous. Fin.*

*Agency for Fed. Home Loan Mortg. Corp. v. Morgan Stanley ABS Cap. I Inc.*, 73 N.Y.S.3d 374, 397 (N.Y. Sup. Ct. 2018). To establish proximate cause, a plaintiff must demonstrate that the damages are not "so remote as not to be directly traceable to the breach" or "the result of other intervening causes." *Nat'l Mkt. Share, Inc.*, 392 F.3d at 526 (citing *Kenford Co. v. Erie Cty.*, 493 N.E.2d 234, 235 (N.Y. 1986)). "[Q]uestions of proximate cause and foreseeability should generally be resolved by the factfinder." *Voss v. Netherlands Ins. Co.*, 8 N.E.3d 823, 829-30 (N.Y. 2014).

"Damages for a breach of contract are normally limited to the amount necessary to put the plaintiff in the same economic position plaintiff would have occupied had the breaching party performed the contract." *Topps Co. v. Cadbury Stani S.A.I.C.,* 380 F. Supp. 2d 250, 261 (S.D.N.Y. 2005) (citing *Wallace Steel, Inc. v. Ingersoll–Rand Co.*, 739 F.2d 112, 115 (2d Cir. 1984)). Under New York law, there are two categories of damages for a breach of contract: "general damages . . . recover the value of the very performance promised, whereas consequential damages seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 618 F. Supp. 2d 280, 292 (S.D.N.Y. 2009) (cleaned up) (citing *Schonfeld v. Hilliard*, 218 F.3d 164, 175-76 (2d Cir. 2000)). Consequential damages "are recoverable only upon a showing that they were foreseeable and within the contemplation of the parties at the time the contract was made." *Am. List Corp. v. U.S. News & World Rep., Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989).

General damages require a less demanding standard. The plaintiff still must "prove[] the fact of damages by a preponderance of the evidence." *Process Am., Inc. v. Cynergy Holdings*, LLC, 839 F.3d 125, 141 (2d Cir. 2016). But once the fact of damages has been established, New

York courts ordinarily will not deny recovery merely because the *amount* of such damages is uncertain. *Contemp. Mission, Inc. v. Famous Music Corp*., 557 F.2d 918, 926 (2d Cir. 1977). The plaintiff need only "show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc*., 487 F.3d 89, 110-11 (2d Cir. 2007) (cleaned up) (citing *Freund v. Washington Square Press, Inc.*, 314 N.E.2d 419, 422 (N.Y. 1974)). "At that point, the burden of any uncertainty as to the amount of damages is on the breaching party." *Process Am., Inc.*, 839 F.3d at 141.

While the standard for proving general damages is less demanding, it is still the "Plaintiffs' burden to provide the Court with a reasonable means of and basis for calculating damages." *Esquire Trade & Fin., Inc. v. CBQ, Inc*., No. 03 CIV. 9650 (SC), 2009 WL 3756470, at *4 (S.D.N.Y. Nov. 5, 2009) (citing *Mehta v. New York City Dep't of Consumer Affairs*, 556 N.Y.S.2d 601, 602 (N.Y. App. Div. 1990)). If a plaintiff does not provide a "stable foundation for a reasonable estimate," then the claim "falls for uncertainty." *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 481 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (quoting *Freund*, 314 N.E.2d at 422); *Cottam v. Glob. Emerging Cap. Grp., LLC*, No. 16 CIV. 4584 (LGS), 2021 WL 1222120, at *6 (S.D.N.Y. Mar. 31, 2021); *PBR Sales, LLC v. Liberty Petroleum Trading Int'l, LLC*, No. 18CIV11639PMHPED, 2020 WL 4353237, at *4 (S.D.N.Y. June 22, 2020*), report and recommendation adopted*, No. 18-CV-11639 (PMH), 2020 WL 4349992 (S.D.N.Y. July 29, 2020). In that event, the plaintiff may only recover nominal damages, which are ordinarily awarded in the amount of one dollar. *See Washington v. Kellwood Co*., 714 F. App'x 35, 42 (2d Cir. 2017); *Cottam v. Glob. Emerging Cap. Grp., LLC*, No. 16 CIV. 4584 (LGS), 2021 WL 1222120, at *7 (S.D.N.Y. Mar. 31, 2021); *Hodges v. Cusanno*, 941 N.Y.S.2d 772, 774 (N.Y. App. Div. 2012).

At trial, Bloomberg established by a preponderance of the evidence entitlement to the following damages, totaling $17,386,082.

### A.  Outstanding license fee payments

First, Bloomberg is entitled to any outstanding license fee payments on the date of termination.  At the time of termination, OMG had not paid $750,000 in past due license fees as scheduled under the Agreement.  Bloomberg bargained for these payments in exchange for licensing its intellectual property, and the damages were therefore the direct consequence of OMG's breach of the Agreement.  *See Pickwick Commc'ns, Inc. v. Weinberg*, 1994 WL 620950, at *13 (S.D.N.Y. Nov. 8, 1994), *aff'd*, 89 F.3d 825 (2d Cir. 1995) (awarding unpaid license fees as damages after defendant breached licensing agreement).  Moreover, because these amounts were owed to Bloomberg by OMG under the Agreement prior to its termination, OSMI is jointly liable as guarantor.

### B.  The cost of the London studio and offices

Bloomberg is also entitled to damages for the cost of providing OMG use of its studio and offices in London.  OMG agreed to pay these costs under the Agreement, which permitted OMG to make use of Bloomberg's London studio and offices and stated that OMG "shall be solely responsible for the payment of any and all charges levied by Bloomberg in connection therewith."  Agreement ¶ 7(c).  Therefore, the costs of the London studio are general damages because they "recover the value of the very performance promised." *Schonfeld*, 218 F.3d at 175 (cleaned up).  And Bloomberg has shown "the fact or existence" of those damages "to a reasonable certainty."  *Hollander Loader Company LLC v. FLSmidth A/S*, 769 F. App'x 40, 42 (2d Cir. 2019) (summary order) (quoting *Tractebel Energy Mktg., Inc.*, 487 F.3d at 110).  It is undisputed that OMG occupied the London studio and offices from approximately July 2013 to

May 2015 and never paid Bloomberg for the use of those spaces. Though OMG argues that Bloomberg did not request any payments from OMG during this time, the Court determines for the reasons discussed above that Bloomberg did not waive its right to bill OMG for these costs at a later date simply because it declined to do so while OMG was occupying the offices. The Court therefore concludes that OMG's breach of this obligation caused Bloomberg damage in the amount of costs incurred providing the use of the spaces.

Because Bloomberg has established breach and causation of damages, Bloomberg "need only show a stable foundation for a reasonable estimate of the damages incurred as a result of the breach," at which point "the burden of any uncertainty as to the amount of damages is on" OMG. *Process Am., Inc., LLC*, 839 F.3d at 141. Bloomberg has provided a stable foundation for the Court to reasonably estimate the cost of the London desks and studio. Bloomberg Media's CEO Mr. Smith credibly testified that based on "Bloomberg's internal accounting," the cost of allowing OMG staff to use each desk was $33,015 per year, and the daily rental cost of studio facilities was an estimated $10,000 per business day, for a total of 450 business days (or 1.8 years, assuming 250 business days a year), amounting to approximately $5,000,000 (or $11,111 per business day). Smith Dec. ¶ 19; DX-459. While Bloomberg did not provide any accounting documents to substantiate these figures, the Court found Mr. Smith to be a credible witness that was generally knowledgeable of Bloomberg's finances and operations, and therefore determines that $11,111 per business day is a reasonable and conservative estimate as to the cost of the studio and desks. The Court will however decrease the amount of days for which Bloomberg can recover from 450 business days to 271 business days. A contemporaneous business record from May 21, 2014 cited the usage as "12-15 desks and TV studio for 8 months," DX-72, and the evidence at trial shows that by November 2014, approximately 5 months later, significant

41

portions of the OMG team had moved out of the London offices to start working in Africa, PX-95. The Court will therefore permit Bloomberg to recover for the costs of the office and studios for 13 months, or 271 business days.

The Court therefore finds that Bloomberg has proven with reasonable certainty that OMG used the desks and studio in London for 271 business days at a cost of $11,111 per business day, for a total cost of $3,011,081. Because these amounts were owed to Bloomberg by OMG under the Agreement prior to its termination, OSMI is jointly liable.

### C. Lost profits

Bloomberg seeks "lost profits" in the form of future license fee payments, future revenue sharing payments, and future advertising revenue it was supposed to receive under the Agreement. In addition to the $750,000 in license fee payments that were outstanding at termination, Bloomberg seeks to recover the remaining license fee payments that it was to receive over the eight-year term according to the schedule set forth in the Agreement, totaling $13.625 million. Amendment ¶ 7. Additionally, under the Agreement Bloomberg was to receive a percentage of gross revenue generated by the Project each year, *id.* ¶ 8, and was permitted to market and sell 10% of available advertising slots on the Channel, Agreement ¶ 5(c)(i). Bloomberg claims that, based on financial projections for the Project created contemporaneously by OMG for distribution to its banks, Bloomberg would have received $27-$28 million in revenue sharing payments and $3-4 million in advertising revenue over the Agreement's eight-year term.

As the Second Circuit explained in *Tractebel Energy Marketing*, under New York law "lost profits" can be either general or consequential damages, depending on the nature of the "lost profits" sought. 487 F.3d at 109-10. "Lost profits are consequential damages when, as a

result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." *Id.* at 109. "By contrast, when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages" because they "are the direct and probable consequence of the breach" and "precisely what the non-breaching party bargained for." *Id.* These future payments "may still be characterized as lost profits since, had the contract been performed, the non-breaching party would have profited to the extent that his cost of performance was less than the total value of the breaching party's promised payments." *Id.*

The "lost profits" that Bloomberg seeks to recover here are general damages. The future license fee payments are general damages because they constitute "a specific amount" that OMG "agreed to pay . . . over a period of . . . years. . . [as] explicitly stated in the contract schedule." *Am. List Corp.,* 549 N.E.2d at 1164. The same is true for the lost revenue. Though the advertising slots and revenue sharing payments technically require additional transactions with third parties, profits which require a collateral transaction can still constitute general damages even though they "involve a third-party transaction." *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676, 682 (N.Y. 2014) (holding that lost profits resulting from a breach of a resale contract for heart stents were general damages). The key distinction is "whether the lost profits *flowed directly from the contract itself* or were, instead, the *result* of a separate agreement with a nonparty." *Id.* at 681 (emphasis added). Like the future license fee payments, the revenue sharing payments and advertising slots are general damages because Bloomberg "bargained for such profits and they are the direct and immediate fruits of the contract." *Id.* (quotations omitted).

As discussed below, at trial Bloomberg proved by a preponderance of the evidence its entitlement to general lost profits in the form of future license fee payments. However, though it is "reasonably certain" that Bloomberg would have received future revenue sharing payments and future advertising revenue, Bloomberg has not provided a "stable foundation for a reasonable estimate" of such damages as required by New York law, *Tractebel Energy Mktg., Inc*, 487 F.3d at 110-11, and therefore can only recover nominal damages for these amounts, *Washington*, 714 F. App'x at 42.

### 1. Future license fee payments ($13,625,000)

Bloomberg seeks to recover as general lost profits the license fee payments it would have received under the terms to the Agreement. OMG argues that Bloomberg has failed to establish that OMG caused Bloomberg these damages because it was Bloomberg's decision to terminate that caused it to lose out on the payments, not OMG's breaches.

The Court disagrees. OMG's material breach of the Agreement directly and proximately caused Bloomberg to lose out on the future license fee payments under the Agreement that it bargained for. As discussed *supra* COL II, OMG materially breached the Agreement because it had become insolvent and was unable to fulfill the most basic obligations for launching the Bloomberg Africa channel. These material breaches "defeat[ed] the object of the parties in making the contract." *VFS Fin., Inc.*, 17 F. Supp. 3d at 380. Under these circumstances, New York law did not require Bloomberg to continue a broken contract with a failing partner, but instead permitted it to "terminate the contract and claim damages for total breach." *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d 401, 408 (S.D.N.Y. 2000) (citing *Lovink v. Guilford Mills, Inc.*, 878 F.2d 584, 586 (2d Cir. 1989)). That Bloomberg was the one to formally cancel the contract does not change the fact that OMG's material breaches ended the parties'

Agreement. But for OMG's performance failures, Bloomberg would not have terminated (as it would not have had the right to) and would have received the payments in accordance with the schedule under the Agreement. At the very least, OMG's material breach of the Agreement was "a substantial factor in producing the damage," which is all that is required to prove causation in-fact for contract damages under New York law. *RCN Telecom Servs., Inc*., 156 F. App'x at 351.

The Court also finds that OMG's breaches proximately caused the loss. Bloomberg's termination was not an intervening cause under New York law. "To break the legal chain, the intervening act must have been of such an extraordinary nature or so attenuated from the defendants' conduct that responsibility for the injury should not reasonably be attributed to them." *NAF Holdings, LLC v. Li & Fung (Trading) Ltd*., No. 10 CIV. 5762 (PAE), 2016 WL 3098842, at *6 (S.D.N.Y. June 1, 2016) (citing *Gordon v. Eastern Ry. Supply, Inc.*, 626 N.E.2d 912, 916 (N.Y. 1993)); *Ordonez v. Long Island R. Co*., 492 N.Y.S.2d 442, 443 (N.Y. App. Div. 1985). Far from being "attenuated from" OMG's "conduct," Bloomberg's termination was the direct and justified result of OMG's inability to continue the Agreement. *Id.* An act is not an intervening cause if it "is a natural and foreseeable consequence of a circumstance created by defendant." *MUFG Union Bank, N.A. v. Axos Bank*, 130 N.Y.S.3d 652 (N.Y. Sup. Ct. 2020) (citing *Hain v. Jamison*, 68 N.E.3d 1233, 1237 (N.Y. 2016)). It was foreseeable to OMG that a failure to remain solvent and inability to fulfill its most basic obligations to launch the Bloomberg Africa Channel would result in Bloomberg's lawful termination, considering that the parties' Agreement expressly provided Bloomberg could do so under those circumstances.

In arguing that the element of causation has not been met, OMG points to two non-binding cases that held, applying New York law, that a plaintiff that had terminated a franchise agreement could not recover future royalty payments under that agreement on the theory that the

termination was the cause of the loss of the future payments, not the defendant's breach.  *See ATC Healthcare Servs., Inc. v. Pers. Sols., Inc.,* No. 01 CV 762 CBA, 2006 WL 3758618, at *11 (E.D.N.Y. Dec. 19, 2006) (report and recommendation adopted with no objections); *Mister Softee, Inc. v. Amanollahi*, No. 214CV01687KMJBC, 2016 WL 5745105, at *13 (D.N.J. Sept. 30, 2016).

These cases are neither applicable nor persuasive.  Although the courts in *ATC Healthcare* and *Mister Softee* were purporting to apply New York law, they did not rely on any decisions of the New York courts.  Instead, those courts adopted the rule from a California court decision in *Postal Instant Press, Inc. v. Sealy,* 51 Cal. Rptr. 2d 365, 370 (Cal. Ct. App. 1996).  In *Sealy*, the California court held that "failing to timely pay *past* royalties and advertising fees was not a 'proximate' or 'natural and direct' cause of the [plaintiff's] loss of *future* royalties and advertising fees" because "[i]t was only when [the plaintiff] elected to terminate that agreement that it ended the [defendant's] ability to produce revenues . . . and also ended its own right to collect royalties on those revenues."  *Id.*  Notably, even as a matter of California law, the persuasiveness of the *Sealey* rule is dubious.  A federal court in California noted that "the *Sealy* decision is mistaken," is not an authoritative source of California law (as it was not rendered by the California Supreme Court), and that its holding was "untenable."  *Radisson Hotels Int'l, Inc. v. Majestic Towers, Inc*., 488 F. Supp. 2d 953, 963 n.10 (C.D. Cal. 2007).  *Sealey* has only been adopted by a small handful of district court cases (including *ATC Healthcare* and *Mister Softee*) and has otherwise "proved to be controversial and generated much critical commentary."  Robert L. Ebe, David L. Steinberg, Brett R. Waxdeck, *Radisson and the Potential Demise of the Sealy-Barnes-Hinton Rule*, 27 FRANCHISE L.J. 3, 5 (2007).  *See also Coraud LLC v. Kidville Franchise*

*Co., LLC*, 121 F. Supp. 3d 387, 399 (S.D.N.Y. 2015) (recognizing that *Sealy* "appears to be the subject of some debate" and resolving the case on different grounds).

In any event, the Court is under no obligation to follow the rule in *Sealy*, as it has not been adopted by New York state courts or the Second Circuit (or courts in this district). At least one other court applying New York law has held that a plaintiff may recover general lost profit damages even if it terminated the contract pursuant to a material breach. *In re Indesco Int'l, Inc.*, 451 B.R. 274, 317 & n.222 (Bankr. S.D.N.Y. 2011). And multiple courts applying similar contract law principles have also determined that a defendant's breach is the cause of plaintiff's lost future royalties or general lost profits, even if the plaintiff formally terminated the contract, if the breach is material or otherwise a "total breach" of the contract. *See Meineke Car Care Centers, Inc. v. RLB Holdings, LLC*, 423 F. App'x 274, 282-83 (4th Cir. 2011); *Susteen, Inc. v. Sourcenext Corp.*, 266 F. App'x 690, 691 (9th Cir. 2008); *Am. Speedy Printing Centers, Inc. v. AM Mktg., Inc.*, 69 F. App'x 692, 699 (6th Cir. 2003); *Leisure Sys., Inc. v. Roundup, LLC*, No. 1:11-CV-384, 2013 WL 12178132, at *5 (S.D. Ohio Jan. 23, 2013). In sum, as the federal court in California noted when rejecting *Sealey*, "where a franchisee breaches a contract and demonstrates that it is unable or unwilling to meet its obligations, lost future profits are a proximate result of the breach because the franchisee's actions are a 'substantial factor in bringing about that loss or damage.'" *Radisson Hotels Int'l, Inc.*, 488 F. Supp. 2d at 963 n.10.

Therefore, the Court applies the principles of causation under New York law, and, as discussed above, determines that OMG's material breach of the Agreement was the direct and proximate cause of Bloomberg's loss of future license fee payments.

Finally, because the fact of damages is "reasonably certain," Bloomberg need only provide a "stable foundation for a reasonable estimate" of the damages. *Tractebel Energy Mktg.,*

*Inc.,* 487 F.3d at 110-11.  The Court need look no further than the Agreement itself, which provided the amounts Bloomberg would receive for these license fees.  Amendment ¶ 7. Therefore, Bloomberg is entitled to recover as general lost profit damages the remainder of the license fee payments it was set to receive under the Agreement, which is $13,625,000.

### 2. Revenue sharing payments ($27-$28 million) and advertising revenue ($3-4 million)

Bloomberg is not entitled to general lost profits in the form of lost revenue from revenue sharing payments and advertising, even though the Court determines that it is "reasonably certain" that the loss of such payments was caused by the breach, because Bloomberg has not provided a "stable foundation for a reasonable estimate" of those amounts.  *Tractebel Energy Marekting, Inc.*, 487 F.3d at 110.  To prove its entitlement to the amount of damages, Bloomberg relies solely on financial projections for the Project that were contemporaneously prepared by OMG management for distribution to banks.  For the reasons described below, the Court finds these projections unreliable and concludes they are insufficient to prove these damages with adequate certainty under New York law.

"Establishing a 'stable foundation for a reasonable estimate' requires putting forth a plausible theory that amounts to something more than a speculative measure of damages." *Cottam,* 2021 WL 1222120, at *5.  Courts will not rely on a party's internal financial projections as a stable foundation for a reasonable estimate of general lost profits if they are not based on reliable data.   For example, in *Holand Loader Company LLC*, the district court determined that the plaintiff could not rely on the defendant's "internal forecasts," which had been "prepared for the purpose of securing . . . funding" and "were not based in any historical data," to establish lost profits because they were "nothing more than speculative" and therefore were not "sufficiently reliable indicators of the gross sales of . . . products that would have resulted had [defendant] the

complied with . . . the IP Agreement." 313 F. Supp. 3d at 481-82. *See also Freund,* 314 N.E.2d at 421 (plaintiff author could not receive lost profits in his breach of contract action against publisher because "he provided no stable foundation for a reasonable estimate of royalties he would have earned had defendant not breached its promise to publish."). Moreover, "[a] defendant's own projections cannot satisfy the requisite level of certainty in situations involving a new product with relatively little sales history." *Inficon, Inc. v. Verionix, Inc*., 182 F. Supp. 3d 32, 37 (S.D.N.Y. 2016). Similarly, courts will find that "the burden of proving general lost profit damages to the requisite level of certainty is even more difficult when the breach of contract case involves a new business or a unique product line" because "'there is no track record upon which to base an estimate' of future sales or profits." *Id.* (quoting *Schonfeld*, 218 F.3d at 172).

The Court finds that OMG's internal projections do not provide a stable foundation for a reasonable estimate of the actual revenue sharing payments and advertising revenue that Bloomberg would have received if OMG had not materially breached the Agreement. According to the evidence at trial, the Project was in fact an ambitious new venture in an emerging market. In *Schonfeld*, the Second Circuit considered a similar project to launch a channel that would air BBC news programming in the United States to be a "new business" for the purpose of determining if there was a stable foundation to estimate consequential lost profits because it would have introduced "a *new product . . .* into a *new market . . .* [with] no established customer base." 218 F.3d at 173. Though the record suggests Bloomberg may have executed similar kinds of licensing agreements in the past and thus could potentially have "produced [] evidence of sales of similar products by which a comparison may be made," *Holland Loader Co., LLC,* 313 F. Supp. 3d at 482, Bloomberg did not provide any such market data regarding profits from

similar ventures. Nor did Bloomberg explain the nature of the data that OMG relied upon in creating these projections or explain how the calculations were performed.

Simply put, to accept these projections as a reasonable estimate would be to take OMG at its word. But the fact that OMG created the projections, or even that it distributed them to banks, does not alone establish their accuracy and reliability. *See Holland Loader Co., LLC,* 313 F. Supp. 3d at 481. Bloomberg's own expert testified that the projections were unreliable. TT 1032-1034. And considering the evidence demonstrating that that OMG management had not been forthcoming about its financial situation in the past, *see supra* FOF III.C, the Court does not accept the projections at face value without supporting evidence as to where the underlying data came from or how the amounts were calculated. Bloomberg otherwise failed to prove these damages at trial.

In sum, Bloomberg did not provide a stable foundation for a reasonable estimate of how much it would have received in revenue sharing payments and advertising revenue. Bloomberg therefore may recover only nominal damages for these amounts.

## VI. ATTORNEY'S FEES AND COSTS

Bloomberg argues that it is entitled to attorney's fees and costs under the Agreement. While ordinarily in federal court practice "each party bears its own attorneys' fees[,] . . . parties may agree by contract to permit recovery of attorneys' fees, and a federal court will enforce [those] contractual rights." *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1312-13 (2d Cir. 1993). In the Agreement, OMG represented that it would "indemnify Bloomberg . . . from and against any and all claims, damages, liabilities, costs, and expenses, including reasonable attorneys' and experts' fees," arising, among other things, "out of or in connection with" a "breach of any provision of this Agreement by the Licensee or any of the Licensee's affiliates." Agreement. ¶

13(a). Bloomberg is therefore entitled to the costs incurred in this litigation, including reasonable attorney's fees, and may submit a request for them along with supporting documentation on the scheduled ordered below.

## VII. CONCLUSION

For the reasons explained above, the Court concludes that OMG has failed to prove its claims for breach of contract and breach of the covenant of good faith and fair dealing. Bloomberg's counterclaim for trademark infringement is also not proven. However, Bloomberg has met its burden of proving its counterclaims for breach of contract against both OMG and OMSI. The Court awards Bloomberg $17,386,082 in damages and determines that OSMI is jointly responsible for $3,761,081 of that award. Bloomberg is also entitled to reasonable costs, including attorneys' fees. Bloomberg may submit a motion for costs and fees no later than June 4, 2021. OMG may file a response no later than June 18, 2021. Bloomberg may then submit a reply no later than June 25, 2021.

SO ORDERED.

Dated: May 14, 2021
      New York, New York

_____
ALISON J. NATHAN
United States District Judge